## PAN–AMERICAN PETROLEUM TRANSP. CO. v. ROBINS DRY DOCK & REPAIR CO.

(Circuit Court of Appeals, Second Circuit. January 30, 1922.)

No. 60.

1. **Bailment ⬅14(1)—Repair contractor, not having made customary tests, must show test made was equally effective.**

Where the contractor, who made certain repairs on a vessel delivered to it, including the overhauling of the electric telegraph, failed to make the test of the telegraph after the repairs in the manner shown by the evidence to have been customary, it must show that the test it did make was equally effective, to enable it to avoid liability for an accident resulting from a wrong connection of the telegraph, especially where the repairs were made during the war, so that tampering with the apparatus might have been anticipated.

2. **Evidence ⬅11—Court judicially knows attempts to injure ships in port were made during the war.**

The court takes judicial notice that constant attempts were being made throughout the war to injure American ships, not only on the high seas, but also in our own ports.

3. **Bailment ⬅14(1)—Delivering ship to owner after repair with telegraph wires crossed is breach of contract to repair.**

Where a contractor to repair a steamship redelivered the vessel to the owners with the telegraph wires crossed, so that a signal to go ahead, sent from the bridge, indicated astern in the engine room, the contractor breached his contract to perform the work according to good steamship practice and with workmanship of the best quality, whether the crossing of the wires was due to the carelessness of the contractor's workmen, or was the mischievous act of some third person while the vessel was in the contractor's possession, and while the wires were uninclosed.

4. **Bailment ⬅31(1)—Repair contractor's possession presumed coextensive in time with work.**

Where a vessel was delivered to a contractor for repairs, it is presumed the contractor's possession was coextensive in time with the work for which possession was surrendered to it, in the absence of any showing to the contrary.

5. **Bailment ⬅22—Of vessel for repairs held terminated only on removal from contractor's dock.**

A bailment of the vessel to a contractor for repairs was terminated when the owner of the vessel attempted to remove it from the contractor's dock, though the repairs were not then entirely completed.

---

⬅For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes
281 F.—7

**6. Bailment ☞31(1)—Bailee for repairs has burden of proving defect immediately after redelivery was not due to his fault.**

Where an accident occurred to a vessel immediately after its redelivery to the owner by a contractor, who had been repairing it, because the electric telegraph on which the contractor had been working the night before was wrongly adjusted, the burden is on the contractor to show it had done its work properly and without negligence.

**7. Admiralty ☞61—Repair contractor held to have had exclusive possession of ship, notwithstanding presence of its officers.**

Where the allegation of the libel that the vessel was delivered into respondent's possession for repairs was expressly admitted by respondent's pleading, the contractor cannot claim it did not have exclusive possession of the vessel during the progress of the work, merely because some of the officers of the ship remained on board while it was being repaired, so that the case does not fall within the admitted exception to the presumption of negligence where the bailee redelivers the goods in bad condition, recognized in cases where the bailee's possession was not exclusive.

**8. Bailment ☞14(1)—Bailee to perform labor owes duty to take ordinary care of property bailed.**

A bailee to whom property is delivered to have work performed thereon is a bailee for reward, who owes the duty to take ordinary care of the property bailed to him.

**9. Bailment ☞14(1)—Bailee for repair is required to use skill adequate to his undertaking.**

Where skill is required in performing the bailee's undertaking to repair, as in the case of work to be done on the electrical apparatus of the vessel, the bailee is charged with engaging to use a degree of skill adequate to the performance of his undertaking.

**10. Bailment ☞14(1)—"Ordinary care" of bailee for repairs is that which prudent man would use in like circumstances.**

The "ordinary care" required of a bailee for hire is that which reasonably may be expected of one in the given circumstances, that degree of care and prudence which discreet persons skilled in the business in hand would be likely to exercise under the same circumstances.

[Ed. Note.—For other definitions, see Words and Phrases, First and Second Series, Ordinary Care.]

**11. Bailment ☞31(1)—Libel held based on breach of contract to repair, requiring respondent to prove performance.**

Where the libel alleged a vessel was delivered into respondent's possession under respondent's agreement to execute certain work, including the overhauling of the engine room telegraph, according to good steamship practice and with workmanship of the best quality, and the answer alleged that respondent had completed its contract fully, the recovery was not sought on the ground of the respondent's negligence, the burden of proving which would be on libelant, but on breach of contract, and, the libelant having proved the contract and the return of the ship with the telegraph out of adjustment, the burden was on respondent to prove performance of its contract.

**12. Bailment ☞31(3)—Evidence held not to show test of repairs was made in presence of ship's officers.**

Evidence that officers of the ship being repaired were on the vessel at the time the contractor made a test of the engine room telegraph, but that such officers were not charged with the care of the telegraph and paid no attention to the test, except to ascertain the ease with which the handles would turn, *held* not to sustain the allegation of the answer that the test was made in the presence of the ship's officers and to their satisfaction.

☞For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**13. Bailment** ☞**14(1)—Owner held not negligent in failing to test telegraph after redelivery of vessel.**

The owner of a vessel is not precluded from recovering damages occasioned by the improper adjustment of the engine room telegraph immediately after the vessel was redelivered to the owner, because the usual test of the telegraph was not made prior to starting the vessel, since such test, which consisted merely of signaling to stand by and the reply thereto, would not have disclosed that the wires were crossed, and since the owner could assume that the contractor had properly performed his work.

Appeal from the District Court of the United States for the Southern District of New York.

Libel in admiralty by the Pan-American Petroleum Transportation Company against the Robins Dry Dock & Repair Company. From a decree dismissing the libel, libelant appeals. Reversed.

Certiorari denied 258 U. S. ——, 42 Sup. Ct. 589, 66 L. Ed. ——.

Burlingham, Veeder, Masten & Fearey, of New York City (Charles C. Burlingham and Ray Rood Allen, both of New York City, of counsel), for appellant.

Harrington, Bigham & Englar, of New York City (T. Catesby Jones and Vine H. Smith, all of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MANTON, Circuit Judges.

ROGERS, Circuit Judge. This suit is brought to recover for a breach of contract which is alleged to have been committed by the respondent in its performance of certain repair work on libelant's steamer George E. Paddleford. The sum demanded is $56,115.31, with interest. The steamship George E. Paddleford was owned by the libelant, a corporation engaged in the petroleum business, and was employed by it in that business. In March, 1918, the ship was in Tampico, and while there met with injuries which made it necessary to make extensive repairs. But the making of these repairs was postponed until the ship reached New York, where she arrived under her own steam, but accompanied by a tug, about June 20th.

The vessel was taken to the Robins dry dock in the Erie Basin for the purpose of having the repairs made; an agreement having been entered into with the respondent to make them "according to good steamship practice and with workmanship of the best quality." About four months were occupied in the making of these repairs, and a large number of the respondent's men were engaged upon the work. At times there were as many as 500 so employed. On November 2d the repairs on the ship had so far progressed that the libelant resumed possession of the vessel and undertook to move her from the respondent's dock in the Erie Basin down to an anchorage off Stapleton. The repair work was not, however, entirely finished, and the ship did not have a full crew on board, and was in fact not in commission. With two or three tugboats alongside of her, she started out from the respondent's Pier 2, where she lay head in. Two tugs were towing her. The captain of one of the tugs was on the bridge in charge of the

operation. The maneuver was to haul the steamer out clear of the pier end, and with the aid of other tugs head her round, so that she could pass out through the gap.

Opposite Pier 2 the steamship Golaa lay alongside the breakwater heading to the southward. When the Paddleford was about half way across the basin, her stern pointing toward the Golaa, the captain, wishing to check the steamer's sternway, ordered her engines "slow ahead." This was the first order of any sort given to the engines. The sternway was not checked, and the captain gave the order "full ahead." Instead of going ahead, the ship went rapidly astern, and the tug captain at once ordered the engines stopped and both anchors let go. These orders were obeyed, but before the Paddleford's way could be stopped she struck the Golaa on the port side, seriously damaging the Golaa, and suffering some damage herself.

The superintending engineer of the libelant company, who was on the ship at the time of the collision, immediately started to find out what the matter was. He encountered the captain of the ship, who told him the engine had been put the wrong way, and together they went down at once to the engine room. This is an excerpt from his testimony:

"Q. Did you find out? A. We did, after a few minutes.

"Q. How did you find out? A. He said the order had been given on deck to go ahead, and that they had gone astern.

"Q. Tell us how you found out what was the matter. A. Well, they told us down below that the telegraph was put either ahead or astern, I couldn't remember which, and I told them to leave it there until I went up on the bridge.

"Q. And then you went on the bridge yourself? A. I went on the bridge myself, and found it was the opposite direction to what I had told them to leave it down below. Then I called down on the telegraph to the engine room, and asked them if the indicator was still where I had left it, and they said 'Yes,' and then I found that the one on the bridge was in the opposite direction.

"Q. Did you try it further? A. Yes; I tried it further.

"Q. At different points? A. At every point on the dial.

"Q. What did you find? A. We found that, when it said full ahead on the bridge, it said full astern down below."

The accident was an extraordinary one. A witness who had 26 years' experience as an engineer at sea, and had superintended the construction of ships and the construction of telegraphs, was asked whether he had ever heard of an accident such as the one in this case, where you threw the telegraph to full speed ahead and you got full speed astern on the engine room telegraph, and when you threw the engine room telegraph full speed astern you got a full speed ahead on the pilothouse telegraph, and he replied that he had not.

The libel alleged that the libelant delivered the George E. Paddleford into the respondent's possession about July 2, 1918, under an agreement with the latter that it would, "according to good steamship practice and with workmanship of the best quality," execute certain repair work, and that it did not execute the work according to good steamship practice, nor with workmanship of the best quality. It set forth the circumstances of the collision with the steamer Golaa on

November 2, 1918, and averred that the collision was due solely to the breach of contract and negligence of the respondent. It stated that a libel had been filed by the master of the Golaa against the Paddleford to recover the sum of $70,000 damages alleged to have been sustained by the Golaa by the collision, and that the libelant, having no defense to the suit, paid the sum of $47,500 in full settlement of said suit and of the claim of the owner of the Golaa, and that said settlement was fair and reasonable, and not in excess of the amount of the damages for which the Paddleford was liable, and that before making said settlement the libelant gave the respondent a notice, and that the respondent made no objection to said settlement. The fourth paragraph of the libel reads as follows:

"Fourth. In the course of executing said work the respondent crossed the wire and chain connection which led from the bridge to the engine room. By reason thereof, when the George E. Paddleford was returned to the libelant's possession, the wire and chain connection was crossed, so that the indicator on the dial in the engine room did not record the orders from the bridge correctly, but in a manner directly contrary to that given, and the return signal from the engine room was also incorrectly recorded."

And it is alleged that the collision occurred in consequence of the crossing of the wires.

The respondent in its answer alleged that it had fully completed the work contracted for in a competent and workmanlike manner, and strictly in accord with the contract therefor between the libelant and the respondent, and the engine room telegraph and the instruments, wires, indicators, and all apparatus appurtenant thereto were all carefully tested by the employees of the respondent in the presence of officers of the said ship, as representing the libelant, and found to be in all respects in good and proper condition and working order, and as so found and after said test the said ship was delivered to and accepted by libelant, its agents, servants, and employees; that, if the collision alleged in the libel occurred as therein set forth, the same was due wholly or in part to a tampering with said wires by some person or persons in the employ of said libelant, or by some person or persons for whose acts this respondent can in no respect be responsible, or to the negligence of the libelant, its agents, servants, and employees, in the care and maintenance of said engine room telegraph apparatus and appurtenances, or in the operation and control of said steamship after she had been duly and formally delivered to and accepted by the libelant, and had left the premises and passed from the custody, care, and control of the respondent, and to the negligence and carelessness of those in charge of the said steamship.

The answer denies that the collision and consequent damage were due or contributed to by any fault or neglect on the part of the respondent, its agents, servants, or employees. It alleges that those in charge of the said steamship George E. Paddleford failed properly to examine and test the engine room telegraph apparatus before attempting to move the said ship from the pier, as they should have done, in accordance with a well-recognized and customary practice.

The bill of complaint as originally filed asked judgment in the sum

of $49,067.69. This included the sum of $47,500 paid for the damages caused to the Golaa, and $1,042.69 paid for counsel fees and expenses in the suit brought against the steamship, and $25 paid for tug service, and $500 the estimated damages suffered by the Paddleford. Subsequently an order was entered amending the complaint by striking out the $500 estimated damages and inserting in the place and stead thereof the sum of $2,010.62, and an additional claim was made for 6 days' demurrage, amounting to $5,562, because of the necessary detention of the ship to make the repairs necessitated by the collision.

The court below dismissed the libel on the ground that the respondents had not been guilty of negligence, and that a test made the night before the accident showed that the telegraph apparatus had been properly connected and was in working order, and the District Judge expressed the opinion that the double crossing of the wires, which was disclosed after the accident was the result of the deliberate act of some unknown person, and that no circumstances existed which would justify holding the respondent liable therefor.

It appears that, in performing the repair work on the steamship the respondent overhauled the telegraph mechanism. The telegraph system of the ship ran from the bridge and pilot house to the engine room. It was used to communicate orders to those in charge of the engines as respects the movements of the ship. It was not in proper condition, and in order to repair it those in charge found it necessary to disconnect the machine and "cut it loose altogether." The chains were all corroded, as were the shives. , The corroded shives were removed, and likewise the chains, and new chains and wires were put in, and the instrument was connected up again. The chains and wires ran from the engine room to the bridge. The mechanism was originally boxed in, but in order to make the repairs it became necessary to remove the casing, and when the work on the telegraph was done the casing was not promptly replaced, but the mechanism was left open and exposed until the night prior to the surrender of the ship to the libelant's possession, when it was boxed in. In the meantime it was left unguarded and without protection.

It also was discovered that the telegraph mechanism was not the only mechanism that was wrong. The steering gear of the ship was also found to be out of order. But it happened that this particular defect played no part in the collision, and indeed was not discovered until after the collision. The plaintiff's superintending engineer testified as to that as follows:

"What did you have wrong with your steering gear on the occasion of this collision? A. Well, at the moment of the collision, so far as I know, the steering gear had never been tried.

"Q. But you did have something wrong with it, did you not? A. Afterwards they found it out; yes, sir. After the ship came out of Erie Basin, we found the telemeter pipes had been misplaced; that is, they had been put in the wrong ends of the cylinder, the wrong pipe.

"Q. That had nothing to do with the collision? A. I don't think so; you will have to ask the pilot, or some of the men on the bridge, about that.

"By the Court: Q. How long after the collision did you know that? A. I should say an hour or more, after she was in the Bay and in the slip, when I

went alongside of her, they were turning the wheel the wrong way; when they gave the order to go to port, the helm went to starboard."

This is a further excerpt from his testimony:

"Q. Who rigged the steering gear telemeter system on the Paddleford? A. The Robins Drydock & Repair Company [the respondent].

"Q. Did you have anything to do with it, or did the Pan-American people? A. Do you mean in putting it together?

"Q. Yes. A. No, sir."

It certainly was a very singular circumstance that the steering gear had been rigged up so as to work the wrong way, and that the ship was evidently delivered into the possession of the libelant by the respondent in that condition, and that no test had been made by the respondent to ascertain whether the steering apparatus was working right at the time the ship was returned to the possession of the libelant. This was something more than a mere coincidence. It indicates that these two occurrences were not merely accidental slips, made by careless workmen, but intentional mischief, maliciously done by some evil-minded and hostile person. The conclusion seems irresistible that it was sabotage, committed to wreck the ship and cause disaster.

It may be noted in passing that respondent surrendered the ship to the libelant's possession on November 2, 1918, and the case was tried the latter part of June, 1920; but the testimony shows that the respondent had never put in a bill for the work it did on the telegraph system. The assistant manager of the department to which such a bill would go testified as follows:

"Q. Did you ever receive a bill for the work of putting the telegraph system of the Paddleford in order from the J. N. Robins Company? A. No, sir; we did not.

"Q. It has never been paid? A. No bill has ever been presented, and therefore nothing has been paid."

We do not understand that this refers to a bill for the work originally done in repairing the telegraph mechanism, but that it relates to the work of readjusting the apparatus found to be necessary after the accident. It is to be kept in mind that the libel alleged, in its third paragraph, that the steamship was delivered "into the possession" of the respondent on July 2, 1918, and that the answer admitted in its third paragraph the allegation. The respondent had the possession of the ship when the repairs on the telegraph apparatus were made. It also appears that the ship was not formally delivered back to the libelant until November 2, 1918, and that when she was returned to the libelant's possession the wire and chain connection of the engine room telegraph apparatus used in the operation and control of the vessel were crossed and not in proper operating condition.

The evidence shows that the respondent completed its work as to the telegraph apparatus on October 16th, but that they allowed it to remain uncased and exposed until the night of November 1st. During this two weeks it was liable to be tampered with by any one so disposed. On the night of November 1st, other electric work was completed about 7 o'clock in the evening, and then between 7 and 7:30 o'clock that night the respondent again tested the telegraph system. The rea-

son for the test was stated by the respondent's assistant chief electrician, who seems to have been in charge of the electric repair work on the ship. He testified that he told one "Sam" ("Sam" was in respondent's employ as foreman in charge of the electric work on board the ship) that—

"while he was over there [on the ship] to give the telegraph a test. We had finished and completed the job, and had it O. K.'d by one of the ship's crew two weeks previous; but nevertheless there were machinists and iron workers and pipe fitters working still on the vessel, and due to neglect or an accident, I was afraid that in some manner our telegraph might have been injured."

It thus appears two tests were made by the respondents of this apparatus, the first on October 16th, when the work on the telegraph apparatus was finished, except inclosing it, and the second on November 1st, the evening before the vessel was to sail; that after the first test was made in October the cover of the wooden casing which inclosed and protected the chains and wires was not replaced, and the wires and chains were exposed and unprotected, and could have been crossed by merely loosening the turnbuckles, and that they were left thus exposed for a period of 16 days; and that after the second test, on November 1st, they were still left similarly exposed and unguarded for a period of 3½ hours before the cover of the wooden casing was put on. During this period of 3½ hours, the ship still being in the respondent's possession, no watch was kept over these exposed wires to see that no one crossed them, and some 200 of the respondent's men were working on the ship during that night. With the casing off there was an opportunity, if not an invitation, to any idle or malicious person to tamper with the chains and wires. No tools were needed to accomplish it. The turnbuckles could be turned by hand, and at the argument in this court it was admitted by the respondent's counsel that this crossing of the wires could be completed by one who knew how to do it in about 60 seconds. This mischievous piece of work was undoubtedly done while the casing was off and the wires were exposed. After the casing was replaced, any one who attempted the job would have had to remove the casing with some instrument and then replace it, all of which would have taken some time and would have exposed the meddler to greater risk of detection.

In what has been said we have assumed, for the purpose of the argument, that a proper test of the telegraph was made on the night of November 1st. But the evidence discloses that the test actually made was not the test resorted to in such cases. This appears from the testimony of the respondent's own witnesses. The respondent placed on the stand its assistant chief electrician, who had charge of the repair of mechanical telegraphs on ships. He testified that there was a common and ordinary practice in the testing of such apparatus. It was for the man making the test to throw a handle on the bridge instrument to full speed ahead, and then walk down to the signal room to see whether the apparatus down there corresponded, and always to leave a man on the bridge "to see that nobody fools with that handle." He testified that that was not only common and ordinary practice of his own firm

(the respondent), but of other firms. The respondent also called to the stand the licensed mechanical expert of the oldest manufacturer of mechanical telegraphs in the country. He testified as follows on his direct examination:

"Q. Tell us how you conduct those trials. A. After the system is all finished and working, there are always two men, a man and a helper working together, and when we get ready for the first test the mechanic calls the helper to the bridge. He shoves the handle full speed ahead, or full speed astern. He leaves it at full speed ahead, and he instructs the helper not to move from that spot until he goes from the bridge to the engine room, to see that the pointer on the indicator in the engine room is in the same position as the handle he has left on the bridge. When he finds it so, he goes from the engine room back to the bridge again, to make sure that everything is all right.

"Q. Is that the invariable practice? A. That is the invariable practice throughout. Our men are all instructed that way."

Then on the cross-examination he testified as follows:

"Q. This method of testing that you say is customary seems to leave nothing to the helper, except to see that nobody fools with the machine while the mechanic is going to the engine room and back again. A. That is right, sir.

"Q. It is a test made by the mechanic, and not by the helper? A. Not by the helper.

"Q. And the mechanic is held responsible for the work; not the helper? A. Yes, sir.

"Q. And when you finish with a job you don't consider that you are absolutely done until the mechanic has himself on the bridge set the signal and told the helper to see that nobody interferes with it, and has gone down to the engine room himself and seen what the signal is, and then has signaled to the helper, gone up again, and satisfied him as to the return? A. That is right. * * *

"Q. It is a part of your job as a repairer of telegraphs to conduct this test as you have indicated? A. Yes.

"Q. You don't consider the job done until you have done that? A. No, sir."

The testimony in the record discloses that the test above described was not employed in making the final test of November 1st. Instead of pursuing the method described, use was made of the telephone. The foreman in charge of the electric work, in testifying as to the test actually made, stated that he told a man by the name of Kilpatrick, one of his electricians, to stand by the telephone while he himself went down into the engine room, and that then he would ring up and let the mate know that he was down there, and then for the chief officer to go full ahead on the bridge and work each quadrant down to stop. Referring to the movements reported to the witness by the telephone, the witness testified:

"Q. Did you check these movements with what you had seen upon the dial? A. I don't remember whether I checked every one; but I know that Kilpatrick and I had an agreement before I went down that he was to tell me which way she pulled, and he was to ask the mate, and the mate told him, and Kilpatrick transmitted it to me through the phone.

"Q. Do you mean that Kilpatrick would say, for instance, 'Full ahead' to you? A. Yes.

"Q. And then you would manipulate the handle so as to put the indicator at full ahead in the engine room? A. No; the mate would ring down to full ahead, and then I would pull down to full ahead, and then I would ask Kilpatrick what was indicated on the dial, and he would answer, 'Full ahead.'

"Q. Was that done at every space, or only at full ahead and full astern? A. Well, I remember—I don't remember just every movement, but I remember some of them. It is so long ago that I can't remember each movement."

[1] The customary method pursued in making such tests not having been followed in this case, it would seem that it should affirmatively appear that the one actually adopted was equally effective; but that does not appear, and no explanation is given for the failure to make the test in the customary manner. If it be assumed, for the sake of the argument, that the second test made at 7:30 p. m. on November 1st, was properly made, and that the apparatus then was in proper adjustment and working correctly, there was an interval of $3\frac{1}{2}$ hours before the apparatus was incased, and during that interval any one could easily have meddled with it and crossed the wires. It seems to us that the respondent during that period of exposure was bound either to have had some guard on duty to see that no one meddled with the apparatus, or if it did not do so that it was bound, either immediately before or again after the wooden cover was put on, to ascertain whether this important apparatus, upon which the safe navigation of the ship depended, was in order and working properly.

[2] The failure to take these precautions, especially at the particular time when these repairs were made, was negligence on the respondent's part. At the time this country was at war, the accident occurring nine days prior to the Armistice, and we may take judicial notice of the fact that constant attempts were being made throughout the war to work harm to American ships, not on the high seas alone, but in our own ports. As the steamship was at the time in the respondent's possession, it was bound to take proper precautions to safeguard it from mischief. This plainly it did not do.

[3] We do not, however, base our conclusion upon war conditions, but hold that, quite irrespective of them, the facts are such as to impose liability upon the respondent for its failure to perform its contract. The presumption is not to be indulged that some outsider maliciously and purposely crossed the wires. What appears from the evidence is simply this: That at the time the respondent delivered the ship to the libelant the telegraph wires were double-crossed. There is no proof as to who double-crossed them. To deliver over the ship with the wires double-crossed was not good workmanship, and was not a compliance with the contract under which the respondent agreed with the libelant to perform certain work upon the ship, including that of overhauling and adjusting the engine room telegraph "according to good steamship practice and with workmanship of the best quality." Whether the crossing of the wires was due to the carelessness of the respondent's own workmen, or was the michievous act of some third person, it is plain that it happened while this machinery was under the supervision of the respondent, who was engaged in the duty of repairing it and putting it in proper condition.

[4] We have heretofore stated that the complaint charged and the answer expressly admitted that the steamship was delivered into the possession of the respondent. It does not appear that the ship was ever delivered back into the libelant's possession until the libelant, on No-

vember 2d, undertook to remove her from the Erie Basin. Even at that time the work upon which the respondent was engaged was not entirely completed, and at the time of sailing the vessel still had·on board 50 or 60 of respondent's workmen. Nothing appearing to the contrary, we should assume that the respondent's possession was coextensive in time with the work for which possession was surrendered.

[5] A bailment may be determined in different ways, and among them by the accomplishment of the object for which the thing was bailed. New York, etc., R. Co. v. New Jersey Electric R. Co., 60 N. J. Law, 338, 38 Atl. 828, 43 L. R. A. 849. It may also, of course, be terminated by mutual agreement. Stearns v. Farrand (City Ct. N. Y.) 59 N. Y. Supp. 384. And by the bailor's resuming possession of the property. Lamson Consolidated Store Service Co. v. Bowland, 114 Fed. 639, 52 C. C. A. 335; Stiles v. Seaton, 200 Pa. 114, 49 Atl. 774. In the instant case it appears to have been terminated by the libelant's resuming possession on November 2d, when the vessel attempted to leave the Erie Basin.

[6] As the accident immediately followed this attempt to move the vessel and was due to the maladjustment of the telegraph apparatus upon which the respondent had been at work the night before, the burden was upon it to show that it had done its work upon it properly and discharged its duty faithfully and without negligence. Because, for the reasons already stated, it failed to do this, it is responsible for the resultant loss in accordance with the well-established principle governing bailments. See Hansen v. Oregon-Washington Railroad & Navigation Co., 97 Or. 190, 188 Pac. 963, 191 Pac. 655; Hayes v. Kedzie, 11 Hun (N. Y.) 577; Isham v. Post, 141 N. Y. 100, 35 N. E. 1084, 23 L. R. A. 90, 38 Am. St. Rep. 766.

[7] The respondent urged below and in this court that it was not called upon to explain the condition of the telegraph, because it did not have exclusive possession, inasmuch as during the time the ship was being repaired some of the officers were on board the boat. It is sufficient to say of this claim that the respondent's pleadings expressly admitted that the vessel was delivered into its possession, and that such admission is without any limitation or qualification. But, notwithstanding this fact, we may call attention to the Hansen Case, supra. That was a case where salmon was stored with the defendant, but the plaintiff had access to it, and while it was in the warehouse opened all the cases, lacquered and put up each tin in tissue paper, and repacked the cases. Despite this fact, and that the plaintiff had access to take samples from time to time, the court held that the general rule governing bailments applied and that the warehouseman had exclusive possession.

It will be admitted that the rule which raises a presumption of negligence in the bailee, where goods are delivered in good condition and are returned in bad condition, does not apply if the possession of the bailee has not been exclusive of the bailor. Bertig Bros. v. Norman, 101 Ark. 75, 141 S. W. 201, Ann. Cas. 1913D, 943; Weller, etc., Co. v. Camp, 169 Ala. 275, 52 South. 929, 28 L. R. A. (N. S.) 1106; Boe v. Hodgson Graham Co., 103 Wash. 669, 175 Pac. 310.

[8] But it is to be observed that the bailment in this case was that classed as "locatio operis faciendi"; there being work and labor to be performed on the thing delivered. Sir William Jones, in his treatise on Bailments, referring to this class of bailments, states:

"If Titius deliver silk or velvet to a tailor for a suit of clothes, or a gem to a jeweler to be set or engraved, or timber to a carpenter for the rafters of his house, the tailor, the engraver, and the builder are not only obliged to perform their several undertakings in a workmanlike manner, but since they are entitled to a reward, either by express bargain, or by implication, they must also take ordinary care of the things respectively bailed to them."

[9] It needs no citation of authorities to establish the elementary principle that, where skill is required in performing the bailee's undertaking, as in the case of the work to be done on the electrical apparatus of this steamship, the bailee must be understood to have engaged to use a degree of skill adequate to the performance of his undertaking. Mack v. Snell, 140 N. Y. 193, 35 N. E. 493, 37 Am. St. Rep. 534; Lincoln v. Gay, 164 Mass. 537, 42 N. E. 95, 49 Am. St. Rep. 480; Miller v. Ben H. Fletcher Co., 142 Ga. 668, 83 S. E. 521.

[10] And it is equally elementary that ordinary care is that degree of care which reasonably may be expected of one in the given circumstances. Nesbit v. Crosby, 74 Conn. 554, 560, 51 Atl. 550. It is such care as reasonable and prudent men use under like circumstances. Cayzer v. Taylor, 10 Gray (Mass.) 274, 280, 69 Am. Dec. 317; Ramsbottom v. Atlantic Coast Line R. Co., 138 N. C. 38, 50 S. E. 448. It is that degree of care and prudence which discreet persons skilled in the business in hand would be likely to exercise under the same circumstances. Kelley v. Cable Co., 7 Mont. 70, 14 Pac. 633. And from what we have said in a former part of this opinion it sufficiently appears, and for the reasons given, that we do not think the respondent exercised the degree of care which the circumstances of the case required of it.

It is true that the libel in the case now before us asserts negligence and the answer denies that negligence existed, and the District Judge has held that the respondent's negligence has not been proven. Because of these facts, we have thought it proper to express our own opinion on the subject of the respondent's negligence.

[11] But we do not base the decision of this case on the ground of the respondent's negligence. It is necessary to keep in mind, what the court below failed to note, that this suit is brought on contract; that it is alleged that libelant delivered the ship into the respondent's possession under an agreement that it would execute certain work according to good steamship practice and with workmanship of the best quality; that the libel alleged that the work to be done included overhauling and adjusting the engine room telegraph; that the libel alleged that the respondent did not execute the work in accordance with its agreement; and that the telegraph was not properly adjusted, nor in proper operating condition, but the respondent negligently and in violation of its contract crossed the wire and chain connection which led from the bridge to the engine room. And the defendant by its answer alleged that it completed its contract fully, in a competent and workmanlike manner,

and strictly in accord with its contract. The issue presented is one within narrow limits. The libelant is not in court alleging performance of a contract as a basis for the recovery which it seeks. In such a case the burden would be on it. But the libelant is in court alleging the nonperformance of the contract, and the defendant is in court alleging that it performed the contract fully. The law is elementary that, where a defendant pleads performance, he assumes the burden of proof. If an affirmative contract to perform some duty is proved, it is then incumbent on the defendant to prove performance or a sufficient excuse for the failure to perform. Atkinson v. Linden Steel Co., 138 Ill. 187, 27 N. E. 919; Burr v. American Spiral Spring Co., 81 N. Y. 175; McGregory v. Prescott, 5 Cush. (Mass.) 67; Johnson v. Bowman, 26 Neb. 745, 42 N. W. 754; Somerset Stave Co. v. Brown, 173 Ky. 194, 199, 190 S. W. 680. When a defendant relies on an affirmative defense he must prove it. Wylie v. Marinofsky, 201 Mass. 583, 88 N. E. 448; Truax v. Heartt, 135 Mich. 150, 97 N. W. 394; Omaha National Bank v. Graham, 98 Neb. 844, 154 N. W. 729.

The burden was on the libelant to prove the contract, and that at the time the respondent delivered back the ship the telegraph was not properly adjusted and in good working condition. This burden was sustained. The presumption then arose that the respondent had not performed its contract, and was responsible for the condition in which the telegraph then was. The burden then rested on the defendant to overcome this presumption, and to establish by a preponderance of the evidence that it had fully performed its agreement, and that the crossing of the wire and chain connection of the ship's telegraph was not due to its workmen's lack of skill, or careless conduct of the work, while the ship was in the respondent's possession. If it can be assumed that it appears, by a preponderance of evidence, that the respondent's workmen were skilled electrical mechanicians, that they thoroughly understood the work upon which they were engaged, and which the respondent had agreed to perform, and that the work of adjustment was, in the early part of the evening of November 1st, properly made, the burden of proof still would be upon the respondent to establish by a preponderance of evidence that, when the ship was turned over to the libelant on November 2d, the telegraph was at that time properly adjusted and in proper operating condition. This burden the respondent has not sustained. After a careful consideration of all the testimony as we find it in the record, we are compelled to say that we cannot agree with the court below that the respondent had fulfilled its agreement.

The District Judge in his opinion was quite right in saying that the case, after all, comes down to a question of the burden of proof. He held that burden rested on the libelant, relying upon the decision of this court in Stevens v. Maritime Warehouse Co., Inc., 263 Fed. 68. In this he was in error. That was a tort action, based solely upon negligence, and the burden rested upon the libelant to prove it. In that particular the two cases are widely different.

[12] In concluding this opinion we should perhaps say that the evidence fails to disclose that the test of the telegraph mechanism made by the workmen of the respondent was made in the presence of the officers

of the ship as representing the libelant, and that it was found to be in all respects in good and proper condition and working order. The allegation in the answer to that effect is not in accordance with the evidence. We refer to the test made on November 1st. Neither is there any evidence in this record to show that, after the respondent turned back the ship to the libelant's possession, the libelant was guilty of negligence in the care and maintenance of the telegraph apparatus and appurtenances or in the operation and control of the ship. It is true that the chief officer of the ship was in the pilot house on the night of November 1st with two of the mechanics of the respondent, and although he worked the handle of the telegraph he made no test of the apparatus, other than to see whether the handle of the instrument worked freely. It was no part of his duty to test the apparatus, and he was incompetent to test it. He testified as follows:

"Q. What have you got to do with the pilot house telegraph system of the ship from the bridge and pilot house to the engine room? A. Nothing to do with it at all.

"Q. If anything was wrong with it, would you undertake to repair it yourself, or have it repaired? A. No, sir.

"Q. Do you know anything about the mechanism of it? A. No, sir.

"Q. Did you ever open it up? A. No.

"Q. Did you ever take off the doors of it in either the pilot house, or on the bridge, or anywhere else? A. No, sir; I never looked inside of one.

"Q. Did any of your deck department ever do it? A. Not to my knowledge.

"Q. Or with your consent? A. No, sir.

"Q. Or by your order? A. No, sir.

"Q. Whose job is it in the ship to look after the telegraph system? A. The chief engineer's."

The chief engineer had charge of the repairs on the Paddleford during the entire period when the respondent's men began work on the vessel in July until the completion of the work. He testified that he was "on the boat all the time, every day." His duty was to see that the specifications were fulfilled. He testified that no one of the respondent's men ever reported to him that the work on the telegraph system was completed or had been tested. On November 1st, the day before the sailing he tried the handle in the engine room to see whether it would turn, and found it worked hard.

The superintending engineer of the libelant company tried the telegraph on November 1st. He described the extent of his test by saying that he "just took the lever and swung it back and forth." He found it was stiff, and made no further tests at that time, but directed the attention of the man who did the work on the telegraph, and asked him to slack it up. He tried it again later that night, and found it worked better. But he made no thorough test of the apparatus, and was not present or asked to be present when the respondent's men made their final test. This is an excerpt from his testimony:

"Q. Did any of Robins' people ask you to attend a test they were going to make to the telegraph system, or report to you that they had made a test of the telegraph system that night? A. They didn't ask me to make a test.

"Q. Did you know they were making a test of the telegraph system that night? A. I supposed they were making one.

"Q. Did they call on you as the superintendent to attend and observe, and see whether it was satisfactory? A. No, sir."

[13] As respects the allegation in the answer that those in charge of the vessel failed properly to examine and test the engine room telegraph apparatus before attempting to move the ship from the pier, we find it without basis in law or fact. The testimony of the chief engineer as to testing the telegraph when a ship is about to leave port was as follows:

"Q. You say half an hour before leaving port the officer throws the handle on the bridge to indicate stand by? A. That is the ordinary custom.

"Q. And the engineer observes that in the engine room? A. The engineer rings back again, and if there is anything wrong he will notify the officer.

"Q. Was that the practice on the Paddleford at that time, on November 2d? A. No; the ship was not in commission when this thing happened; she was not really in commission, because they were just moving out."

It is not disclosed by the testimony that such test as the one usually made before the ship gets under way would have disclosed the crossing of the wires which caused this accident. Moreover, it seems to us that those in charge of the ship had a right to assume, when the ship was turned back that morning into the possession of the libelant, that the repairs on the telegraph mechanism the respondent had engaged to make had in fact been properly made.

Decree reversed.