## UNITED STATES v. NEWPORT NEWS SHIPBUILDING & DRY DOCK CO.

District Court, E. D. Virginia. July 1, 1927.

**1. Bailment ⟜23—Shipyard receiving vessel for repairs must redeliver in accordance with contract or show that failure was not due to its negligence.**

In case of delivery of a vessel to a shipyard for repairs, the latter is required to redeliver in accordance with the contract, or to show that its failure was not due to its own negligence.

**2. Bailment ⟜14(1)—Shipyard held liable for damage by fire of vessel in its plant under contract for repairs.**

Where the contract under which a vessel was delivered to respondent's shipyard for repair required respondent to exercise the degree of care exercised in high grade repair yard practice and expressly provided that as precautions against damage by fire it should maintain a system of inspection over the action of welders, acetylene burners, painters, and similar workmen, should have at all times a line of fire hose under pressure in each section involved, with at least one man on duty to operate the same, and provide chemical extinguishers, and boxes, and other approved oil fire extinguishers, evidence that a fire which seriously damaged the ship originated in a small freshly painted stateroom, in which three employees were working with tools and materials, one with an open gasoline furnace, with no showing of the presence of any of the required fire preventives, places liability for the damage on respondent.

**3. Bailment** ⚖️ 14(1)—**Provision in contract under which vessel was delivered to shipyard for repairs that owner would continue its insurance held not to exonerate contractor from liability for failure to perform conditions of contract or for negligence.**

In a contract under which a vessel was delivered to respondent's shipyard for repairs, containing numerous and specific provisions requiring respondent to take safeguarding precautions during the work, a bracketed clause that the owner would continue its present insurance *held* to mean no more than that it would continue such insurance for additional protection, but without exclusion of its right to hold respondent liable for damages for failure to carry out the other provisions or for negligence.

In Admiralty. Suit by the United States against the Newport News Shipbuilding & Dry Dock Company. Decree for the United States.

Paul W. Kear and H. H. Rumble, both of Norfolk, Va., and F. R. Conway and J. Frank Staley, both of Washington, D. C., for the United States.

F. H. Skinner and E. M. Braxton, both of Newport News, Va., and Burlingham, Veeder, Masten & Fearey, R. H. Hupper, C. I. Clark, and P. F. Shortridge, all of New York City, for respondent.

GRONER, District Judge. The United States, as owner of the steamship America, contracted with the Newport News Shipbuilding & Dry Dock Company for repairs to the vessel, to be done at the yard of the company at Newport News, Va. The contract was in writing, and included detail specifications of the work to be done and special provisions as to the manner of performance and the care to be taken for the vessel's protection while at the contractor's plant. When the work was more than 99 per cent. completed, fire broke out and did damage claimed to amount to $2,000,000. This is a suit to hold the contractor responsible, and the determination of that question involves ascertainment of the respective obligations of the parties under the contract and this, for purposes of clarification, makes somewhat extended reference to the contract necessary.

The contract was dated January 4, 1926. The vessel left New York January 6, arrived at the shipyard January 7, and the fire occurred March 10. A considerable part of the crew remained aboard while the work was in progress. Under the contract, the repairs were to be completed not later than March 11, and demurrage for delay was fixed at $4,000 for each day. The various provisions

of the contract prior to article 10 thereof dealt with the character of work, the price, the manner of performance, changes which might be ordered, and such like matters. Article 10 of the contract contains all of the provisions which are material in determining the respective contentions of the parties:

"Article X. Protection and Insurance.

"1. The contractor shall at all times provide protection adequate in the judgment of the general manager of the United States Lines, or other duly authorized representative of the United States Lines, to protect fully the vessel, the work and all of the property of the United States Lines at contractor's plant or on the vessel: Provided, however, that the exercise of judgment by the general manager of the United States Lines or other duly authorized representative of the United States Lines provided for in this paragraph, and protection furnished by the contractor in accordance therewith, shall not release the contractor from any liability or responsibility it may be under, irrespective of the provisions of this paragraph and howsoever arising.

"2. Without limiting by the provisions hereof any liability of the contractor, howsoever arising, it is understood that from the delivery of the vessel to the contractor until its redelivery to the United States Lines, after the completion of the work or while the work hereunder is being performed, the contractor shall be responsible for and protect and save harmless the United States of America, the United States Shipping Board, the United States Shipping Board Emergency Fleet Corporation, the United States Lines, and the vessel against all losses: [Provided, however, that the United States Lines will continue the present hull, machinery, and equipment insurance upon the vessel during the period the vessel is at the contractor's yard, but the contractor shall, at its own expense, protect the United States Lines through a builder's risk insurance, for the amount of this contract, and for such of the United States Lines' material removed from the vessel, or as may be placed in storage at the contractor's plant], accidents, injuries, and/or damages of any nature to the vessel (except demurrage which is provided for hereinunder and provision relating to liquidated damages) and/or the vessel's equipment and/or its cargo and/or its movable stores and/or to the crew or property thereof, through any act or default or neglect of the contractor, and/or of any of the

contractor's agents or employees, or in any other case where losses, accidents, injuries or damages shall have been due to causes within the control of the contractor, or where such losses, accidents, injuries, or damages could have been prevented by the contractor by the exercise of a degree of care exhibited in high grade repair yard practice, including (but not limited by such specific mention, the generality of this requirement) the following precautions:

"The contractor shall take precautions to protect the ship from fire in every possible way, including the prompt removal of rubbish, care in the use of inflammable materials and torches, care of electric wiring, strict prohibition against smoking, and in all other ways to prevent fires and add to the safety of the ship. The United States Lines reserves the right to permanently refuse admittance to the ship, or expel therefrom any of the contractor's employees who violate the rules laid down from time to time to carry out the intent of these clauses.

"The contractor shall maintain an efficient system of inspection over the activities of welders, acetylene burners, painters, and similar workmen employed by him under this contract, so as to minimize the danger of fires occurring through carelessness or otherwise. He shall have at all times while such work is in progress, a line of fire hose, under pressure, available in each section involved and at least one man on duty at all such times solely for the purpose of operating this hose in emergency. In addition, the contractor will provide chemical fire extinguishers in ample quantities (and sand boxes or other approved oil fire extinguishers and at all locations where directed) to supplement the hose protection. Wherever steel plates are being burned through under this specification, adequate provision must be made to prevent sparks coming in contact with inflammable material; and the contractor will be required to adopt such other reasonable measures in this connection as may be directed by the United States Lines.

"Wherever a rivet forge is being used over a wood deck, it shall be set in a tight, shallow metal-lined pan, at least four feet by five feet, to protect wood deck from cinders, coals, and hot rivets. If, in spite of this precaution, burned spots occur on the deck in the vicinity of the rivet forges, contractor shall patch or replace the deck in a suitable manner approved by United States Lines' representative, to remove such burns.

"3. For the purpose of this contract, the vessel shall be considered as having been delivered to the contractor when access thereto has been afforded the contractor, whether the vessel be at the contractor's plant, at anchor in a stream or harbor, tied up at a wharf, dock, pier, loading or discharging berth, in dry dock or elsewhere, and in whatever condition; and for the purposes of this contract the vessel shall be considered as being in the possession of the contractor until the work hereunder shall have been completed to the satisfaction of the United States Lines, irrespective of where or in what condition the vessel may be. Completion of this contract shall include the removal from the vessel of all the contractor's tools, equipment, etc., and all rubbish.

"4. The contractor shall at its own expense protect and save harmless the United States of America, the United States Shipping Board, the United States Shipping Board Emergency Fleet Corporation, the United States Lines, and the vessel from all claims and liabilities ordinarily covered by proper casualty or liability insurance, and workmen's compensation insurance. It is expressly understood that the workmen engaged upon the work hereunder shall at all times be employees of the contractor and/or subcontractors, and not of the United States of America, or of the United States Shipping Board, or of the United States Shipping Board Emergency Fleet Corporation, or of the United States Lines.

"5. The contractor shall be responsible for the safety and proper keeping of materials, equipment, and supplies furnished by the United States Lines for the purpose of being installed in the vessel or used in the work. In the event of loss or damage to such materials or supplies after being furnished by the United States Lines and before being installed or used, the contractor shall replace the articles or repair the damages at his own expense."

Paragraphs 6, 7, 8, 9, and 10 are omitted as immaterial.

"11. The United States Lines reserves the right to maintain at its own expense, officers, watchmen and crew on board the vessel, who shall be solely responsible to it and under its sole direction."

Article 17 of the contract is as follows:

"1. All understandings and agreements of every kind heretofore had or alleged to have been had between the parties hereto, or any of their agents or representatives, whether written or verbal, are embodied in this contract, which is now the one and only con-

tract between the parties hereto relative to this subject-matter."

It is contended on behalf of the United States that the failure of the shipyard to complete the repairs and deliver the vessel in the condition required by the contract was a breach thereof, and imposes upon the shipyard the burden of proof to excuse the failure on its part to perform its obligations under the contract. On the other hand, it is insisted on behalf of the shipyard that the libel charges negligence on the part of the shipyard in failing to exercise the degree of care exhibited in high grade repair yard practice in performance of the work, and the precautions necessary for the safety of the vessel, and that, therefore, under the rule— that he who charges negligence must prove it—the burden of proof is on the United States.

The question is important, because of the paucity of evidence of the cause of the fire. Although it was stated at the trial that witnesses were at hand, who were present in the room in which the fire started, they were not called by either party. The United States relied upon the answers to certain of the interrogatories which they duly offered in evidence, and the shipyard was content to leave the proof in this respect where the United States stopped. If the burden of the evidence was with the United States, and if to sustain that burden it was necessary that they should prove by clear and satisfactory evidence that the negligence of the shipyard was the proximate cause of the damage complained of, a much more difficult case is made than if the burden of proof is on the respondent to show that it was not negligent in the performance of the work.

In the recently decided case of International M. S. S. Co. v. Fletcher Co., 296 F. 855 (C. C. A. 2d Circuit), which arose out of a fire on a vessel in a shipyard, Judge Hough, speaking for the court, announced the following as the applicable rule: "Undoubtedly the general rule is that negligence is never presumed, and he that alleges it must prove the same; yet where one receives a chattel in certain condition, and redelivers it with marks of injury that only culpable negligence would probably cause, 'it is the bailee who should open his mouth and make explanation to relieve himself'; and certainly slight evidence under such circumstances will shift the burden of evidence. Schouler, Bailments, § 23, and cases cited."

In an equally recent English case in the Court of Appeal (The Ruapehu, 21 Lloyd's List Law Rep. 310) the question of the onus of proof, under circumstances very much like those present in this case, was discussed with great learning, and the conclusion reached by Lord Justice Atkin as to the correct rule was as follows: "If this were a pure bailment, a delivery of a chattel to a bailee, intrusted with the chattel to execute repairs on it and redeliver it to the owner, I apprehend that the bailee would be under the obligation to exercise reasonable care and skill in preserving the safety of the chattel. If he failed to deliver the chattel at all, the onus would be upon him to show that the nondelivery was not due to absence of care and skill on his part. Moreover, if he redeliver the chattel in a damaged condition, or if during the bailment the chattel were damaged, so that when repaired it would be redelivered damaged, the onus is upon the bailee to show that the damage was not due to the absence of reasonable care and skill on his part."

He then continues: "If, then, the present case were not complicated by the presence on the ship of some of the owners' servants, there would seem to be a simple case of bailment, and an onus on the defendants to show that the fire was not caused by negligence on their part. How far is the position altered by the presence of the owners' servants? I do not think that the rights reserved to the owners to retain the use of the vessel for certain purposes prevents the transaction from being one of bailment; but I think that the principle of onus of proof must in such a case be modified though not destroyed."

In applying the rule he says: "A material question in this case would appear to be: When did the fire originate? If during the working hours, the onus would be upon the defendants to show that it was not occasioned by their negligence. If during nonworking hours, then the plaintiffs must discharge the onus of showing that injury was caused from defendants' negligence."

Another case in which the rule is extended farther than in either of the two preceding cases is that of Pan-American Co. v. Robins Dry Dock Co., 281 F. 97 (C. C. A. 2d Circuit). That was a suit against a shipyard to recover damages occurring to libelant's steamer by a collision caused by defective repair work. The late Judge Rogers, in discussing the question, said: "The burden was on the libelant to prove the contract, and that at the time the respondent delivered back the ship the telegraph was not properly adjusted and in good working condition. This burden was sustained."

Here it is admitted. "The presumption then arose that the respondent had not performed its contract, and was responsible for the condition in which the telegraph then was. The burden then rested on the defendant to overcome this presumption, and to establish by a preponderance of the evidence that it had fully performed its agreement, and that the crossing of the wire and chain connection of the ship's telegraph was not due to its workmen's lack of skill, or careless conduct of the work, while the ship was in the respondent's possession."

The cases cited in respondent's note—like Southern Railway Co. v. Prescott, 240 U. S. 632, 36 S. Ct. 469, 60 L. Ed. 836—are not, in my opinion, in point, for in all such cases the bailee was a mere custodian, whereas in the cases from which I have quoted, as in this case, the bailment was that known as "locatio operis faciendi." Pan-American Co. v. Robins, etc. (C. C. A.) 281 F. 108.

[1] The result is, I think, to place the burden of proof in such cases upon him who has the best opportunity of knowing, and therefore being able to explain, the cause of the damage. In other words, in the case of damage to a vessel delivered to a shipyard for repairs, where the crew remain aboard, but where the shipyard employees are in control of the parts of the ship under repair, and the fire which caused the damage started there, the burden of explanation would be upon the respondent. If it started where libelant's servants were in charge, the burden of showing that the negligence of the respondent was the proximate cause would have to be borne by the ship, which is just another way of saying that, in all cases of delivery of property to a bailee for repair, the latter is required to redeliver in accordance with the agreement, or to show that his failure to do so is not due to his own negligence.

[2] In this case the fire occurred while the vessel was lying moored to the dock at respondent's plant. Repairs to her machinery and equipment and furnishings to the amount of $200,000 had been more than 99 per cent. completed. Employees of the shipyard were on board doing work required by the contract. The fire started in stateroom 219 on C deck, and at the time it started there were present in the room a plumber and two joiners—all servants of the shipyard. The plumber was working on a basin pipe. One of the joiners was attaching hardware, and the other was standing by. In the room was a plumber's furnace, which was lighted, and

a soldering iron, a carpenter's sawhorse and miscellaneous carpenter's tools. The furnace of a gallon capacity was operated by gasoline. Painting had been done in this stateroom on the day preceding the fire, and some of the paint on the walls of the stateroom was not entirely dry. One of the men was using the furnace unaided, and, as is stated by respondent in answer to interrogatory 6, "a fire started, and before it could be extinguished caused substantial damage to the vessel."

This is substantially all the evidence with regard to the origin of the fire, but, in my opinion, it is enough to throw upon the shipyard the duty of explanation, and correspondingly the duty of exculpating itself by showing that it was not due to the negligent use of the open furnace in this freshly painted room. Its employees were at work in the place where the fire occurred. One of them was using an open flame furnace, without an assistant, in the proximity of wooden partitions made additionally inflammable by wet paint, and in a stateroom 10½ by 13 feet, in which small space were crowded the different articles and tools heretofore mentioned, together with the usual accessories, consisting of bunks, couches, wardrobes, etc. Precisely how the fire started is not disclosed, but the shipyard and its employees are in a better position than any one else to explain away this uncertainty, and this it has not done.

The obligation of care on the part of the shipyard commensurate with the danger arose, not only out of the bailment, but out of an express agreement in writing to exercise the degree of care exercised in high grade shipyards, and in addition to provide certain enumerated and specific precautions against damage by fire. Among these latter was the maintenance of a system of inspection over the action of welders, acetylene burners, painters, and similar workmen to minimize the danger of fires through carelessness—to have at all times while the work was in progress a line of fire hose under pressure in each section involved, and at least one man on duty for the purpose of operating the same, and to provide chemical fire extinguishers in ample quantity, and sand boxes and other approved oil fire extinguishers to supplement hose protection.

In answer to sundry of the interrogatories, it nowhere appears that this obligation was discharged. Certainly it may be reasonably assumed that none of these preventives of fire were in the stateroom in which the fire began, because it is fair to assume that, if so, they would not purposely have been omit-

ted in answer to the interrogatories from the list of things which were shown to have been there. There is therefore in this case, not only a failure on the part of the respondent to discharge the obligation, if I am correct in thinking that such was its duty, of showing that the fire was not caused by its negligence, but there is in the admissions in the answers to the interrogatories enough, without explanation, to satisfy me that the fire should not have occurred except by the negligent use of fire by its employees (Atlas Powder Co. v. Benson [C. C. A. 3d Circuit] 287 F. 797), and there is coupled and added to all of this the failure on the part of the shipyard to have at hand the particular fire-fighting apparatus which it had specifically agreed it would maintain.

I am therefore constrained to hold that, while ordinarily the use of an open furnace in vessel repair work, and ordinarily the occurrence of a fire on board a ship, would not in themselves create, as against the workman engaged in making repairs, a presumption of negligence, when, as is the case here, the use of the one and the happening of the other are shown to follow in immediate sequence in a part of the vessel under respondent's exclusive charge, and there is superadded to this the further fact that the walls, where the work was in progress, were inflammable from the use of wet paint, it is enough, I think, to impose upon the person in charge the duty of explanation to escape liability. On the other hand, if it be said that there is nothing in the evidence to justify a conclusion that the use of the furnace was under the circumstances inherently dangerous but that its use was necessary and proper and in the exercise of ordinary care altogether safe, then it follows just as certainly that the happening of the fire, in the circumstances, imposed a duty of explanation, without which a presumption of failure to use due care may arise.

[3] Respondent, however, insists that, whatever may be the opinion of the court on the subject of the origin of the fire and the liability ordinarily incident thereto, the question is academic and the discussion of it bootless, because in this case the United States assumed the risk of damage by fire to the hull of the vessel to the full amount of such damage. The basis of this contention is the bracketed proviso in article 10 of the contract, as follows: "That the United States Lines will continue the present hull machinery and equipment insurance upon the vessel during the period the vessel is at the contractor's yard, but the contractor shall, at its own expense, protect the United States Lines, through a builders' risk insurance, for the amount of this contract and for such of the United States Lines' material removed from the vessel, or as may be placed in storage at the contractor's plant."

This provision, it is claimed by respondent, meant that the United States would look to this insurance rather than to the contractor, and would hold the latter free from liability for its negligence; that it was in effect a bargain between the parties as to how the risk should be divided. Evidence was introduced by respondent to explain the circumstances under which this language happens to be found in the contract. It was objected to by the United States as immaterial, and as tending to vary and contradict the written contract. It was admitted by the court, pending consideration of the entire case. So far as it related to the negotiations prior to the making of the contract, and is explanatory rather than contradictory, it is admissible; so far as any witness undertook to make his own interpretation of the contract, it is inadmissible. Without attempting to be specific in this regard, it is enough to say that under the heading last mentioned much of the testimony of the witness Bunker, in relation to his own views of the scope of the insurance clause, ought not to be considered.

Such evidence as is admissible shows that, some time prior to the actual contract, invitations were sent to various shipyards to bid on work which the United States desired done on the America. Respondent's bid was low, and on December 8, 1925, its vice president, Mr. Palen, called at the office of Mr. Rossbottom, the general manager of the United States Lines, acting for the Shipping Board and the United States, to close the contract. He was informed that the bids were all too high, and the work to be done would be curtailed and new bids invited. During the progress of the discussion, Mr. Rossbottom called the attention of Mr. Palen to a provision in the bid submitted by his company to the effect that his company would not be liable beyond "its legal liability," and that the contract should be upon its standard form, and inquired what this provision meant, Palen replied: "We intend to limit our liability to our legal liability." The conversation then continued:

"I [Rossbottom] said: 'What in blazes does that mean?' He [Palen] said: 'For instance, suppose we have an earthquake, we wouldn't be legally liable for that.' I said: 'Then suppose you are careless, and something happens to the ship because of your carelessness, would you be responsible for

that under this clause?' He then said: 'Well, if we are legally liable for that, we would be liable; but, if we are not legally liable for it, we wouldn't be liable.' I then turned to Mr. Petersen and said: 'It looks to me as if this kind of a clause doesn't give us any protection whatever. It is much better for us to continue the present marine insurance that we have through the Shipping Board, because that will give us some protection. At least, it will give a protection that is satisfactory to the owner; but this gives us no protection whatever. If these bids are rejected, and we invite new specifications, we might just as well include in the new specifications a clause to the effect that we will continue the present marine insurance, because the contractors don't offer to give us any protection whatever.'"

Mr. Palen was examined as a witness, and testified as to the conversation between the parties at the conference of December 8. His recollection of the language there used was more or less vague, though he stated that the impression upon his mind of the purport of the conversation was perfectly clear, and was in effect that the discussion related to the various items which formed a part of the cost of the work under the first specification, and that the effort was to eliminate as many of these as possible, in order to bring the cost within the Shipping Board's limit, and that among these items was $5,000 as the cost of insurance on the hull while the vessel was at the shipyard, and that it was understood this would be eliminated and the owner continue the then existing insurance through the Shipping Board, and that as a result of all of this, when he made his second bid on the revised specifications, he eliminated the $5,000 item for insurance, because he understood that the contractor would not be required to carry insurance or to furnish that form of protection, since it was proposed that the then existing insurance on the vessel's hull, etc., would be continued.

Rossbottom, in his testimony, denied that this conversation had occurred, or that he ever suggested to Palen the elimination of the $5,000 item on account of insurance, or that anything was said which would justify the suggestion that the United States was going to assume the risk of the vessel while she was at the repair yard, but insists that the whole conversation on the subject of insurance grew out of the proviso inserted in the shipyard's bid with regard to its liability, and which, by reason of his inability to interpret satisfactorily, he felt it desirable the company should continue its then existing insurance.

All of the witnesses were men of character and of reputation for ability, and doubtless also of veracity, and it is not at all remarkable that in a general discussion, having for its object the making of a contract, many things should have been said which neither can now remember, or that things which now appear to have been said were probably never said at all. The evidence of precisely what did occur is for this reason wholly unsatisfactory, and is confusing rather than enlightening in furnishing the key to any obscurity in the challenged provision of the contract. There can be no doubt, I think, that a contract whereby the United States agreed to assume all liability for damage to its vessel while at the yard would be valid. Santa Fé Railway v. Grant, 228 U. S. 177, 33 S. Ct. 474, 57 L. Ed. 787. I think it is equally true that a contract might have been made whereby the United States would agree to give the shipyard the benefit of its insurance. International M. S. S. Co. v. Fletcher, supra.

The question, however, obviously is not whether such a contract might be made, but is whether it was in fact made. When the bid of the Newport News Company was received for the work included in the amended specifications—that is to say, its second bid —it was in precisely the same form as its previous bid and contained the same proviso, viz.: "All the foregoing is submitted with the understanding that general clauses variously referred to shall not be held to impose on the contractor any liabilities beyond his legal liability, and that, in lieu of the form of contract attached to the specifications, the work, if awarded to this company, will be executed under a contract substantially similar to this company's standard form of contract for merchant work." Notwithstanding which, it abandoned its insistence upon its standard form, and signed the contract as prepared by the United States, and its rights must be determined by the terms of that contract.

If there is ambiguity in the contract, it is proper to explain it by evidence showing as nearly as possible the intention of the parties when it was written; but evidence to this effect should be clear and satisfactory. Mr. Palen's evidence does not measure up to this standard, and the evidence of Mr. Rossbottom emphatically negatives such a conclusion as is now contended for. Mr. Petersen, who was also present at the conference, likewise denies that at any time there was any state-

ment made by anybody that the United States would be responsible for the vessel while at the yard, and in my opinion it is immaterial what impression might have been made on the mind of Mr. Bunker as to the purpose of the insertion in the contract of the provision in relation to insurance, unless the impression was shown to be the result of apt words on which to base it. It may indeed be asked: Why was the questioned clause included? What purpose did it serve? And the answer to this is not as clear as it might be, but, given all possible effect, I think it can be taken to mean no more than an undertaking on the part of the owner to carry its own insurance, and to that extent to protect itself in addition to, but not in exclusion of, such protection as was afforded by the other provisions of the contract, and that it probably arose out of the uncertainty in the muddled mind of the owner's representative as to the extent to which the latter went. Whether, in the event of loss through fire, the yard would be subrogated to the rights of the beneficiary under the policy, is a question which need not be discussed, for in this particular case there were neither policies nor insurance, but the whole matter was nothing more or less than a bookkeeping arrangement whereby the United States insured itself.

To hold, as the respondent would have me hold, that there was an understanding or meeting of minds whereby the United States agreed that the contractor need not carry any insurance, either for their protection or its own, would be to write into the contract something that is not there. To hold that the United States agreed to discharge the contractor from all liability for negligence, and to be content with the insurance, would be to deny to the other provisions of the contract to the contrary all effect, and to give to the vague and uncertain language of the conference an importance wholly unjustified by anything that has been made to appear.

If the United States had in mind to do what the respondent now claims, the innumerable provisions in the contract imposing liability upon the shipyard would have been wholly out of place; and if the shipyard had so understood the contract, it, of course, would never have signed it with these distinct pronouncements of liability for failure to perform its contract appearing again and again in the document. The very paragraph in which the insurance clause appeared imposes upon the contractor the duty of adequate protection to the vessel at all times. It imposes upon the contractor, not only the duty of providing protection which it regarded adequate,

but such additional protection as the representative of the United States might insist upon, and includes also a provision that such protection, that is to say, such as the yard itself regarded as adequate, and such as was insisted upon by the representative of the United States, even when furnished, should not release the yard from any liability or responsibility it might be under for damages occurring through its negligence.

All of this would be meaningless if the contract was what is now contended for. At most, I think, it can be construed as nothing more than an undertaking on the part of the United States to protect itself by carrying its own insurance, without surrendering any right or claim which it might have against the contractor for the omission, for failure to do the things specifically agreed, or for negligence in their performance. Nothing in the language of the proviso, and nothing in the evidence, would justify the conclusion that the insurance was to be for the benefit of the shipyard—a valueless provision, even if it were true, since the parties all knew that what is called insurance was not insurance at all—or that it was to stand in the place and stead of a claim against the shipyard for negligence. If this had been its purpose, then the whole of paragraph 10, save that which imposed the obligation of insurance on betterments, might have been eliminated from the contract.

A decree for reference may be presented.