### McCORMICK v. SHIPPY.

(Circuit Court of Appeals, Second Circuit. July 1, 1903.)

No. 183.

1. CHARTER PARTY—CONSTRUCTION AND VALIDITY OF PROVISIONS—LIABILITY OF CHARTERER FOR LOSS OF YACHT.

It is competent for a charterer of a pleasure yacht to stipulate in the charter party against his liability for loss or damage to the vessel through his negligence, there being no question of public policy involved; as in case of a common carrier.

2. SAME.

A provision of a time charter party for a yacht that "the charterer shall assume no responsibility for loss or damage to the yacht" must be construed to include loss through his negligence, since for a loss from any other cause he would not be liable without such provision, and when considered in connection with other provisions requiring the payment of hire until redelivery, "unless lost," and the return to him of hire paid in advance, should the vessel be lost, it shows that it was the intention of the parties thereby to exempt him from liability for loss in any event.

3. SAME.

A provision in a time charter party for a yacht that the charterer shall "maintain the yacht in a thoroughly efficient state in hull and machinery for and during the service" binds him only to make the wear and tear repairs which would otherwise be imposed by law upon the owner, and is not in conflict with a clause exempting him from responsibility for loss or damage to the vessel.

Appeal from the District Court of the United States for the Southern District of New York.

In Admiralty. Appeal from a decree (119 Fed. 226) dismissing a libel against the charterer for loss of libelant's yacht.

Robert S. Benedict, for appellant.

Chas. C. Burlingham, for appellee.

Before LACOMBE, TOWNSEND, and COXE, Circuit Judges.

TOWNSEND, Circuit Judge. The court below in its opinion has fully stated and discussed the facts herein, from which it reached the

conclusion that the charterer was the owner pro hac vice, and would have been responsible in all respects for the master's negligence, provided he had not exonerated himself by a special and binding stipulation in the contract.

The contract between the parties was expressed by a charter party which provided that the owner let the yacht from August 15, 1901, to September 15, 1901, "fitted for service, including necessary equipment," on certain conditions, those relevant to this inquiry being as follows:

"(1) That the charterer shall provide and pay for all coal, port charges, pilotage, provisions, wages of crew, deck, engine room and other necessary stores, and all other charges whatsoever, and shall maintain the yacht in a thoroughly efficient state, in hull and machinery, for and during the service. The yacht to be delivered in commission by the owner.

"(2) That the charterer shall assume no responsibility for loss or damage to the yacht."

"(4) * * * Hire to continue until her delivery in like good order and condition to the owner, unless lost, at New York, N. Y."

"(7) That, should the yacht be lost, hire paid in advance and not earned, reckoned from the day of her loss, shall be returned to the charterer."

The charter was subsequently extended to October 31st, and the full amount of charter money, $6,500, was paid to the owner.

The circumstances bearing on liability for the loss of the yacht are well stated in the opinion of the District Judge, as follows:

"I find that the yacht was delivered to the charterer in conformity with the provisions of the contract, and remained under the charge of the master, who had been for some time before employed by the owner when the yacht was in his own service, and who was regarded by him as entirely competent to navigate the yacht, both as master and pilot, in any waters with which he was familiar, and in any waters within the limits of the contract, in conjunction with local pilots. The owner recommended the master to the charterer fully in these respects, and he was accepted and relied upon by the latter, who was not himself competent to navigate the yacht, in all respects in which a yacht owner or charterer might reasonably depend upon an expert navigator. During the earlier part of the chartered period the yacht had been employed in trips east, through Long Island Sound. Upon one of these trips the charterer had mentioned to the master a possible trip to the Delaware Bay, in the vicinity of Cape May, and on the 8th of September, when the yacht was in New York Harbor, the charterer gave orders to the master to fit her out for such a trip. The master was not familiar with the waters of Delaware Bay, or the approaches thereto, but said there would be no difficulty in making a daylight run, and asked for charts of the vicinity, which the charterer provided. The start was made on the 10th, though not at as early an hour as was expected, and it was getting dark when the vicinity of Atlantic City was reached; but the master did not suggest the necessity of making harbor there, and the charterer, relying upon the master's ability to navigate the yacht safely to her destination, gave no orders for a harbor. The weather was very fine at the commencement of the voyage, but it had become somewhat overcast, and the sea had increased, with a southerly breeze, but there was nothing then to excite apprehension, and the voyage was continued. About 8 o'clock in the evening the vicinity of Cape May was reached. At this time the sea was rough enough to affect this small yacht, and the master concluded to seek the shelter of the Delaware Breakwater, near Cape Henlopen, instead of going to Cape May, as originally intended. He had been studying the charts on the way down, and concluded that he was competent to navigate the vessel into the harbor without the aid of a pilot, and was so confident of his ability that he not only did not seek a pilot boat, but suffered a steam pilot boat to pass him, without observing her, on her

124 F.—4

signaled offer to furnish a pilot, notwithstanding the charterer, and a guest who was with him, suggested to him that a pilot should be obtained. Proceeding with a view that he understood the situation, having passed the Over Falls Lightship on his port hand, he steered, as he thought, for an entrance to the breakwater harbor, but made no allowance for a strong ebb tide, with the consequence that he lost his bearings, and, still going ahead, brought the yacht up on the point of Cape Henlopen, where she became a total loss, fortunately without loss of life."

Upon these facts the court held as follows: "There can be no doubt that the loss was attributable to the master's negligence; * * *" and that the charterer "was responsible in all respects for the master's negligence, unless he had exonerated himself by a special and binding stipulation in the contract."

As the determination of the question whether the charterer was the owner of said yacht, pro hac vice, is unnecessary to the decision of the case, we express no opinion thereon.

Nor is it necessary to decide whether the evidence justified the conclusion of the court below that the charterer would have been liable if he had not exonerated himself by stipulation in said charter party. Whether the master was himself negligent or not, there was no negligence on the part of respondent in employing him. He was selected, hired, and recommended by libelant, and he had entire charge of the crew and of the yacht and its navigation without interference from respondent.

It is contended, however, that respondent was personally negligent in the failure to provide a pilot in unfamiliar waters. There might be considerable force in the argument that the charterer could not by said general clause exempt himself from liability for negligent failure to comply with the specific agreement in said charter that he should provide pilotage, if the evidence showed any negligence in this regard. But he was not a seafaring man; he had had no experience in the management of yachts; he might reasonably have supposed that, if a pilot was needed, the master, confessedly a competent navigator, would notify him, especially in view of the fact, as found by the court, that "the charterer was willing and desirous of furnishing a pilot on this occasion, but the master did not consider the employment of one necessary."

It is not clear from the evidence in what respect, if any, the charterer was guilty of negligence. But if it be assumed either that the loss was attributable to his negligence, or to such negligence of the master as should be imputed to the charterer, the question arises whether he has exempted himself from such liability by the clause in the charter party, "The charterer shall assume no responsibility for loss or damage to the yacht."

The contention of the libelant is that the language is not sufficiently specific to free the contracting party from liability arising out of his negligence; that it is repugnant to the clause providing that the charterer shall maintain the yacht in a thoroughly efficient state; and that, read in connection with other clauses in the charter, it shows that the charterer agreed to do certain things, and was liable for a failure, through negligence, to keep such agreement.

The general doctrine is stated by Judge Nelson in New Jersey

Steam Navigation Company v. The Merchants' Bank, 6 How. 344, 383, 12 L. Ed. 465, as follows:

"If it is competent at all for the carrier to stipulate for the gross negligence of himself, and his servants or agents, in the transportation of the goods, it should be required to be done, at least, in terms that would leave no doubt as to the meaning of the parties."

There is no question of public policy involved in this charter party, as in the case of a common carrier. It is well settled that the parties in such a case have the right to provide by apt language against liability for negligence. Hartford Fire Insurance Company v. Chicago, Milwaukee & St. Paul Railway Company, 175 U. S. 91, 98, 20 Sup. Ct. 33, 44 L. Ed. 84; Baltimore & Ohio Southwestern Railway Company v. Voight, 176 U. S. 498, 505, 20 Sup. Ct. 385, 44 L. Ed. 560. It is also well settled that an ordinary bailee for hire can only relieve himself from liability for negligence upon clear and convincing proof that such was the intention of the parties. The question herein is whether the evidence fulfills this requirement.

It appears from inspection of the second article of the charter party that it originally read as follows:

"(2) That the yacht shall be insured for the benefit of the owner, and that the charterer shall assume no responsibility for loss or damage covered by the terms of said insurance; the premium on the policy of insurance to be paid by the charterer."

It was amended by erasing all reference to insurance, and adding the words "to the yacht," and the owner procured insurance on the yacht. The only legitimate inference to be drawn from such erasure and interlineations is that the owner originally proposed that the charterer should insure the vessel for his (the owner's) benefit; that, the charterer refusing to do so, the charter party was so amended in order to relieve the charterer from liability for loss or damage. The clause must be interpreted to include loss through his negligence, because for loss not arising from negligence he would not be liable. The charterer of a vessel is a bailee for hire, and "is only responsible for ordinary diligence and liable for ordinary negligence in the care of the property bailed." Clark v. United States, 95 U. S. 539, 542, 24 L. Ed. 518; Sun Printing & Publishing Association v. Moore, 183 U. S. 642, 654, 22 Sup. Ct. 240, 46 L. Ed. 366.

The charter, taken as a whole, shows that in no event was the charterer to be liable in case of loss. Thus, article 4 provides for the continuance of the hire until delivery, "unless lost"; article 7 provides, "should the yacht be lost, hire paid in advance" should be returned to the charterer.

But it is contended that the charterer's agreement in article 1 of the charter, to "maintain the yacht in a thoroughly efficient state in hull and machinery for and during the service," conflicts with this view. But this clause only provides for the assumption of a legal obligation by the charterer to make wear and tear repairs, which otherwise would be imposed by law upon the owner. In charter parties "the owner usually stipulates that the ship is sound, staunch, and seaworthy; that he will keep her in repair, perils of the sea excepted; * * * but, if these obligations were not expressed, the law would impose them on

the owner." "He is therefore bound, unless prevented by the perils of the sea or unavoidable accident, to keep her in proper repair." 3 Parsons on Contracts (Shipping) p. 302; Work v. Leathers, 97 U. S. 379, 24 L. Ed. 1012. That this clause was intended to apply to such repairs as were necessary in running the yacht further appears from the provision for "delivery in like good order and condition to the owner, unless lost." If this clause has any bearing on the clause exempting the charterer from liability for loss or damage, the two may be well read together to the effect that, while the charterer "shall assume no responsibility for loss or damage," he agrees to so "maintain the yacht in a thoroughly efficient state, in hull and machinery, during the service," as to keep her in like good order and condition "until her delivery to the owner, unless lost."

The decree of the District Court is affirmed, with interest and costs.