### INTERNATIONAL MERCANTILE MARINE S. S. CO. v. W. & A. FLETCHER CO.

(Circuit Court of Appeals, Second Circuit. February 4, 1924.)

No. 140.

**1. Bailment ⚙⇒14(1)—Nature of relation and care required where ship delivered for repairs.**

    Where a ship was delivered to respondent's yard for repairs, the contract for the repairs was one of bailment implying the exercise of ordinary care only, but both care and skill were necessary for due performance; wherefore the bailee by law undertook the work with whatever degree of care was adequate for due performance.

⚙⇒For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

**2. Bailment ⊕⟝31(1)—Presumption as to negligence in injury to ship delivered for repairs.**

Though the general rule is that negligence is never presumed and he that alleges it must prove it, yet where one receives a ship in a certain condition for repairs, and redelivers it with marks of injury that only culpable negligence would probably cause, the bailee should make explanation to relieve himself, and slight evidence under such circumstances will shift the burden of evidence.

**3. Bailment ⊕⟝14(1)—Use of torch near varnish removed held negligence and proximate cause of damages.**

The use in close proximity, on a ship being repaired, of blowtorch and highly inflammable varnish remover, *held* negligent and the proximate cause of damage from fire.

**4. Bailment ⊕⟝31(1)—Burden on respondent to show agreement releasing it from negligent injury.**

In a suit for injuries by fire to a ship delivered to respondent for repairs, if respondent was released from liability for negligence by an agreement that it should not be liable for any risks that could be insured against, the burden to prove that such agreement was made rested upon the respondent.

**5. Bailment ⊕⟝31(3)—Agreement to release from liability for negligence in repairing vessel held not proved.**

In a suit for injuries to ship delivered to respondent for repairs, *held*, that respondent did not prove with sufficient clearness an agreement to release it from liability for loss ordinarily coverable by marine insurance, such as a negligent fire.

Mayer, Circuit Judge, dissenting.

Appeal from the District Court of the United States for the Southern District of New York.

Libel by the International Mercantile Marine Steamship Company against the W. & A. Fletcher Company. From a final decree for respondent, libelant appeals. Reversed and remanded, with directions.

Certiorari denied 44 Sup. Ct. 454, 68 L. Ed. ——.

Libelant was the owner of the steamship St. Louis, and the libel alleges that "on November 17, 1919, (it) delivered St. Louis into the possession of respondent at its ship repair yard in Hoboken, N. J., under an agreement with respondent whereby respondent agreed to repair said vessel."

It was alleged and proven that "in the work of repair a large number of respondent's servants * * * were working in different parts of the St. Louis. Some of respondent's servants were removing varnish from the rails and spindles of the grand staircase of the St. Louis and for that purpose were using a highly inflammable volatile liquid varnish remover."

It is also alleged that at the same time "other servants of respondent were removing paint from various places on or about said staircase and close to the place where the varnish was being removed and for that purpose were using an open flame blowtorch or paint burner."

It is alleged, and was admitted, that shortly before 4 p. m. on the date given, fire broke out on the St. Louis in the square of the grand staircase, which fire spread with the utmost rapidity, shortly passed beyond restraint, and necessitated filling the St. Louis with water, so that she sank. In sinking she listed against another vessel of libelant's lying alongside, and injured that vessel.

This suit was brought to recover damages on the theory that the cause of fire was negligence of respondent. That negligence is alleged in very general terms; e. g., "in failing properly to safeguard and protect libelant's property * * * and in permitting said ship to catch fire."

⊕⟝For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes

But it is obvious from the more specific allegations of fault that the theory of suit was that the fire was caused by permitting the open flame of the blowtorch to come too close to the highly inflammable varnish remover.

Respondent's answer "denies that it was using an open flame blowtorch close to the place where the varnish was being removed."

It denies the allegations of negligence generally, and sets up the following affirmative defense: "Respondent avers that it undertook to and did repair * * * the St. Louis on the basis of libelant paying for the labor, material, use of tools, machines and equipment employed and used in making such repairs, and workmen's liability insurance on the men employed in accordance with an agreed scale of charges for each of said respective items, and of libelant keeping in full force during the period of such repairs the then existing insurance on * * * the St. Louis, and giving unto respondent the benefit of said insurance in order that full protection would be had against loss or damage resulting from perils or losses covered by said insurance; and of libelant assuming all of the usual risks on said * * * St. Louis ordinarily coverable by insurance."

The court below held the respondents negligent and found that the fire resulted from their negligence.

But it further found that "it was a condition of the agreement (for the repair of the St. Louis) that the Fletcher Company should not be liable for losses ordinarily coverable by marine insurance, of which fire is certainly one."

Therefore the libel was dismissed and libelant took this appeal.

Charles C. Burlingham, Chauncey I. Clark, and Ray Rood Allen, all of New York City, for appellant.

Kerlin, Woolsey, Campbell, Hickox & Keating and Haight, Smith, Griffin & Deming, all of New York City (Ira A. Campbell, John M. Woolsey, and Clarence B. Smith, all of New York City, of counsel), for appellee.

Before ROGERS, HOUGH, and MAYER, Circuit Judges.

HOUGH, Circuit Judge (after stating the facts as above). There are two questions at bar: First, were the respondent's servants so negligent in performance of their work that such negligence caused libelant's loss; and, second, did respondent do that work under a contract that excused or released it from the consequences of negligent performance?

We consider both these queries as of fact, but (as usual) the facts fit into and are to some extent interpreted by a context of law.

[1] The contract for reconditioning the St. Louis and other vessels belonging to libelants was one of bailment (Pan American v. Robins [C. C. A.] 281 Fed. 97), and respondents, the bailees, were to do the work with their own servants, at their own yard. That contemporaneously libelants were to do, and were doing, other work is immaterial. The portion of the ship where fire broke out was wholly under respondents' control.

The assumption of such an undertaking implies the exercise of ordinary care only, but both care and skill were necessary for due performance, wherefore these bailees by law undertook to do the work with whatever degree of skill was adequate for due performance. 6 C. J. 1118, and cases cited. As Prof. Williston puts it (Contracts, § 138):

"The degree of care which one who assumes or undertakes a certain act is held bound to exercise depends upon the degree of skill which he professes, and one who professes special skill will be liable for failure to use that skill."

While the learned writer just cited is strongly of the opinion that any action against a bailee for nonperformance really sounds in tort, that distinction is of no importance in the admiralty, and we shall assume, with the court below, that on failure to return the St. Louis properly reconditioned, the bailees can be held only on a showing of negligence causing failure to perform.

[2] Undoubtedly the general rule is that negligence is never presumed, and he that alleges it must prove the same; yet where one receives a chattel in certain condition, and redelivers it with marks of injury that only culpable negligence would probably cause, "it is the bailee who should open his mouth and make explanation to relieve himself"; and certainly slight evidence under such circumstances will shift the burden of evidence. Schouler, Bailments, § 23, and cases cited.

[3] In the present instance it was shown, and is admitted, that the fire was sudden and violent in the extreme; the only highly inflammable substance known to be there or thereabouts was varnish remover,[1] lavishly used as we find. In close juxtaposition, how close the evidence leaves us in doubt, to those using the remover, and their containers for immediate supply, there was a man, if not men, using blowtorches to remove paint. The weather was cold, which made at least the wax more rigid than usual; how it could affect the alcohol is neither shown nor suggested. The function of the wax is to form a film on the outspread remover, and thus prevent the rapid volatilization of the active removing agents. Obviously even the proximity of the powerful heat of a torch would melt the wax, and release the vapors naturally rising from a compound of alcohol and benzol—and by the inventor's evidence it is these vapors that cause the especial danger of the compound when near fire.

There had been two earlier but small blazes on the very day of disaster, thought (as we read the evidence) to have been caused by the blowtorch, yet men using both means of removing varnish and paint worked, not perhaps side by side, but in what we are compelled to think dangerous proximity.

The court below found that the immediate cause of final fire was the blazing of cotton waste, which, soaked with alcohol or benzine, was used to wipe off the remover, and then thrown down on deck; although buckets were provided for holding such waste. This is probably true, but what caused the remover-soaked waste to blaze is the vital inquiry. The only cause suggested by the evidence is the blowtorch, and the maintenance of that probable cause in proximity to so much inflammable material was itself negligence. Liability is measured by the known

[1] The nature and properties of this remover were testified to by its inventor. The inflammability of a composition of alcohol, benzol, and wax need not be dwelt upon. The patent once covering the same (Ellis, 714880) was considered and upheld by this court in Chadeloid, etc., Co. v. Wilson, 224 Fed. 481, 140 C. C. A. 189. The remover was and is equally efficacious for paint as for varnish. It was intended to supplant the use of "blowtorches," and to do away with what Coxe, J., called "the dangers of the torch method" of taking off old brush applied wood coverings.

dangers to be guarded against, and if care according to the circumstances is wanting, the natural inference is that injury accrues from the known danger—it is caused by the lack of care. The blowtorch near remover and waste was negligence, the danger of fire was well known, and we find adequate cause proximately existing in that negligence for the ensuing loss. The Strathdon (D. C.) 89 Fed. 374; Brown v. Standard, etc., Co., 247 Fed. 303, 159 C. C. A. 397.

Taking up the second question, it is to be noted that whatever contract was made rests wholly in parol. The talks which preceded libelants' sending the St. Louis and other of their vessels to respondents' yard were between the president and secretary of respondents and president and vice president of libelants.

First the respondents' officers saw the president of libelants and the scale of prices was agreed on in principle; but there is no suggestion that directly or indirectly was it then agreed, or even mentioned, that any variation was to be made from the usual arrangement of bailment, inferable from sending a ship to a repair yard.

Respondents' whole case depends on what happened, between the two officers of respondents and the vice president of libelants when they subsequently met. The secretary testified (his president corroborating):

"I told (the vice president) that these rates (i. e., the prices suggested to libelants' president) did not include any insurance; that we would not assume any of the risks that could be covered by insurance."

He did not testify that libelants' vice president in terms agreed to this, but declared the latter officer's reply or comment was that his own "insurance would be in effect." Nor was any contract then concluded, but according to respondents' evidence the vice president "thanked us for coming over, and asked us to leave our schedule of rates with him. * * * He said he would let us know." And there was nothing about release from such liability as this in the schedule, and the matter was concluded by sending the ships to the yard.

This whole case, thus far, depends therefore on whether respondents said, and libelants heard, understood and agreed to the words above quoted. The vice president of libelants certainly categorically denied hearing or understanding any such proposition, and in our judgment denied as positively as any man of good manners could in dealing with an old acquaintance—that respondents' secretary ever uttered it.

Much is sought to be made of the fact that some weeks after the St. Louis had gone to the yard of respondents, they talked over the much larger job of reconditioning the Leviathan with libelants' president; he then acting for the United States Shipping Board. At this talk respondents signified their willingness to do the work on Leviathan on the same "basis," or the same "terms and conditions" as in the matter of the St. Louis, and they agreed to a form of words (drawn by counsel present) that if they did the work the owner of Leviathan, i. e., the "United States will assume all risks on the steamer and materials delivered to the contractors ordinarily coverable by insurance."

It is difficult for us to see the competency of this evidence; but when it is observed that the libelants' president knew nothing at all of what

had occurred between his vice president and respondents' officers, that the paragraph drawn by counsel differs widely from the phrase so carefully testified to by respondents' officers as having been used in their dealings with libelants, and that the answer verified by respondents' president departs from both versions of what the Fletchers wanted, we are clear that the Leviathan incident casts no light on the St. Louis agreement.

We will assume that a contract giving to respondents the benefit of libelants' marine insurance (one of the pleaded versions and utterly unsupported by any evidence), or a contract that the bailee would assume no liability growing out of risks ordinarily, or that could be insured against, would be legally enforceable between the parties, if it is a real meeting of minds, made on due consideration. Santa Fé, etc., Co. v. Grant, 228 U. S. 177, 33 Sup. Ct. 474, 57 L. Ed. 787; McCormick v. Shippy, 124 Fed. 48, 59 C. C. A. 568. Cf. C. J. vol. 6, p. 1112, and cases cited.

[4, 5] But the question here is (to vary the form first above stated) have the respondents proved that such an agreement was made—for the burden is on them to prove it. This is true generally from the nature of a bailment, and particularly here, because respondents pleaded this defense affirmatively. Furthermore it cannot be forgotten that the substance of the plea is that respondents aver that they were freed from the consequences of their own negligence. They can be, when no considerations of public policy prevent (The Oceanica, 170 Fed. 893, 96 C. C. A. 69, certiorari denied 215 U. S. 599, 30 Sup. Ct. 400, 54 L. Ed. 343), but, however the contract be stated on behalf of respondents, there is no verbal allusion to negligence in it. To be sure, freedom from negligence liability may result from such words, but somehow or other the meaning must be plain; not perhaps to a layman, but certainly to a lawyer (Santa Fé v. Grant, supra), and to that lawyer the language used must be clear and unambiguous, it must reveal not only the design of one party, but the intention of both parties (McCormick v. Shippy, supra, at page 51; Price v. Union, etc., Co., [1904] 1 K. B. 412; Mynard v. Syracuse, etc., Co., 71 N. Y. 180, 183, 27 Am. Rep. 28; North American, etc., Co. v. Cincinnati, 172 Fed. 214, 97 C. C. A. 32; Ten Eyck v. Director General [C. C. A.] 267 Fed. 974, certiorari denied 254 U. S. 646, 41 Sup. Ct. 14, 65 L. Ed. 455).

By assumption, not decision, it may be agreed that even if libelants did consent to any of the forms of words suggested by respondents in evidence or answer, or to the form used by the court below (that respondents should not be liable for losses ordinarily coverable by marine insurance), the question of fact remains: Has it been affirmatively proved that such agreement was made in clear and unambiguous language? We feel assured that it has not been proved.

Decree reversed, with costs, and cause remanded, with directions to assess libelants' damages.

MAYER, Circuit Judge (dissenting). Just how the fire occurred is, as might be expected, a very puzzling question. However, I am inclined to the view stated by the District Court. I recognize the force of

what is said in respect of the blowtorches in the opinion of this court, but I am not prepared to conclude that the blowtorches were negligently used.

In respect of this subject, there can, of course, easily be a difference of opinion, and I appreciate that on appeal the appellate court may arrive at the same result as the court below through a different approach.

The question as to what the parties contracted seems to me to be on a different basis. I do not lose sight of the fact that it is settled law that an appeal in admiralty is a new trial. At the same time, when witnesses appear, weight is always given to the fact that the trial judge saw and heard the witnesses. This becomes especially important where the conclusion of the judge must necessarily be based upon his estimate of the truth of the testimony or the accuracy of the recollection of witnesses. The agreement between the parties was entered into carelessly and informally between men who knew each other well and who evidently had a high regard for each other. That is the sort of thing which men of large affairs often do and, when the unfortunate event thereafter occurs, they find themselves in opposition to each other and compelled to resort to their memory.

There is nothing in this record which indicates anything more than a difference in recollection. The two officers of respondent had much at stake, but so also did the vice president of libelant. The agreement testified to on behalf of appellee is one which seems to me very likely in the circumstances, and, if the testimony of the younger Fletcher (particularly) is accepted, I think it was intended to refer to any risk which could be covered by insurance. Obviously, the job was just the kind of job where the appellee would run risks through the negligence of its own employees. Indeed, it may be said that any fire or other disaster would more likely occur from some negligent act of appellee's employees than from some outside cause.

Several questions were asked of Mr. Thomas in regard to the testimony of the younger Fletcher as to the conversation in the office of Mr. Thomas. The recollection of Mr. Thomas differed from that of the younger Fletcher, and he felt that he had "a reasonably good memory, and that, if he had heard anything like that to which Mr. Fletcher, Jr., testified, he would certainly have remembered it." Finally, however, he was asked, "You do not absolutely deny that Mr. Fletcher, Jr., made that statement in your office?" To this Mr. Thomas answered, "No, I don't absolutely deny it. I simply say that to the best of my recollection he did not." I do not construe that as a polite way of saying that Mr. Fletcher, Jr., had not told the truth, but I take the words as they appear on the printed page of the record, and thus as meaning that Mr. Thomas did not feel that he could go further than the "best" of his recollection. This court in an appeal in admiralty can, of course, reject testimony which seems unlikely. In cases involving navigation, testimony is sometimes not susceptible of being reconciled with well-known rules of navigation or the maneuvers described may be so out of the ordinary as to require closer scrutiny than that accorded by the trial court.

Here, however, we have testimony as to an agreement which suggests neither lack of possibility nor lack of probability.

A judge of great experience, particularly in this branch of the law, after a most careful consideration, had brought to bear not only his knowledge and estimate of men in the analysis of their recollection as to a vital fact, but also his knowledge of such transactions in maritime circles.

When, therefore, in this case, this court disagrees with the conclusion of the court below, the question is how far we can go, when on the record, as I view it, the fact could have been decided either way and the decision, whichever way it went, would fundamentally rest upon the greater and legally very important advantage, which the trial judge has in a case, as said before, when he has seen and heard the witnesses.

I think also that we should not draw too fine a distinction between the language used in the office of Mr. Thomas and that used at the so-called Leviathan conference. Business men, when the negotiation is on, ordinarily do not speak in careful legalistic language, and, as is often gathered from all the relevant circumstances, when laymen use words which seem to lawyers to be different, they really mean the same thing on each occasion.

Judge Ward pointed out that "all the witnesses on this subject are men of the highest character and standing," and he was confronted with the problem of deciding as to differences in recollection, and his decision did not carry with it reflection on any of those concerned.

Summarizing what has been said supra, my view is that the trial judge was in the best position to determine what was the agreement between the parties, and therefore that this court should accept that determination unless it can say (as I think it cannot) that the probabilities clearly point the other way.

I think the decree should be affirmed.