## NEWPORT NEWS SHIPBUILDING & DRY DOCK CO. v. UNITED STATES.

Circuit Court of Appeals, Fourth Circuit.
July 1, 1929.

No. 2685.

Roscoe H. Hupper and F. H. Skinner, of Newport News, Va. (Burlingham, Veeder, Masten & Fearey, Chauncey I. Clark, and Ira A. Campbell, all of New York City, E. M. Braxton, of Newport News, Va., and P. Fearson Shortridge, of New York City, on the brief), for appellant and cross-appellee.

F. R. Conway, Asst. Admiralty Counsel, U. S. Shipping Board, of Washington, D. C., and H. H. Rumble, Sp. Asst. to the Atty. Gen. (Paul W. Kear, U. S. Atty., of Norfolk, Va., J. Frank Staley, Sp. Asst. to the Atty. Gen., and Arthur M. Boal, Admiralty Counsel, U. S. Shipping Board, of Washington, D. C., on the brief), for appellee and cross-appellant.

Before WADDILL, PARKER, and NORTHCOTT, Circuit Judges.

NORTHCOTT, Circuit Judge. This is an appeal by Newport News Shipbuilding & Dry Dock Company from an interlocutory decree in admiralty, entered October 6, 1927, in the District Court for the Eastern District of Virginia, in favor of United States of America, holding the shipbuilding company liable on the ground of negligence for the damages sustained by the United States by reason of a fire on board the steamship America, on March 10, 1926, while the ship was undergoing repairs at the yard of the company at Newport News. A cross-appeal from the decree was taken by the United States.

The parties will be hereinafter referred to as the United States and the shipyard.

The United States, owner of the steamship, America, desired to have certain repairs made on the vessel, and advertised for bids under specifications. The bids when received were found to be for a greater sum than the owner wished to pay for the repairs, and the specifications were changed and a re-advertisement was had. The respondent shipyard was low bidder in both instances, and secured the contract for a much less sum than it had bid under the first specifications.

The first specifications required the carrying, by the shipyard, of insurance on the hull of the vessel, while under repair, in the sum of $2,000,000. The premium on a commercial insurance policy for that sum, protecting both the owner and the contractor, was $5,000, and that sum was included in the first bid of the shipyard. The second set of specifications, among other changes, included this provision as to insurance:

"Sheets No. 13, No. 14, and No. 15, Ar-

ticle X of the Contract Form are revised to the extent that the Owner will continue the present hull, machinery, and equipment insurance upon the vessel during the period the vessel is at the Contractor's yard, but the Contractor will be required to place at its own expense a Builder's Risk Insurance for the amount of this contract, and for such of the owner's material removed from the vessel, or as may be placed in storage at the Contractor's plant."

The shipyard eliminated the $5,000 item in its second bid, and the United States got the benefit of that sum.

The contract was awarded to the shipyard, and a contract, dated January 4, 1926, was signed in writing. The pertinent parts thereof are set out in the able opinion of the learned judge below, and are as follows:

## "Article X.

### "Protection and Insurance.

"1. The Contractor shall at all times provide protection adequate in the judgment of the General Manager of the United States Lines, or other duly authorized representative of the United States Lines, to protect fully the vessel, the work and all of the property of the United States Lines at Contractor's plant or on the vessel, provided, however, that the exercise of judgment by the General Manager of the United States Lines or other duly authorized representative of the United States Lines provided for in this paragraph, and protection furnished by the Contractor in accordance therewith, shall not release the Contractor from any liability or responsibility it may be under, irrespective of the provisions of this paragraph and howsoever arising.

"2. Without limiting by the provisions hereof any liability of the contractor, howsoever arising, it is understood that from the delivery of the vessel to the Contractor until its re-delivery to the United States Lines, after the completion of the work or while the work hereunder is being performed, the Contractor shall be responsible for and protect and save harmless the United States of America, the United States Shipping Board, the United States Shipping Board Emergency Fleet Corporation, the United States Lines and the vessel, against all losses (provided, however, that the United States Lines will continue the present hull, machinery and equipment insurance upon the vessel during the period the vessel is at the Contractor's yard, but the Contractor shall, at its own ex-

pense, protect the United States Lines through a Builder's Risk Insurance, for the amount of this contract, and for such of the United States Lines' material removed from the vessel, or as may be placed in storage at the Contractor's plant), accidents, injuries and/or damages of any nature to the vessel (except demurrage which is provided for hereinunder and provision relating to liquidated damages) and/or the vessel's equipment and/or its cargo and/or its movable stores and/or to the crew or property thereof, through any act or default or neglect of the Contractor, and/or of any of the Contractor's agents or employees, or in any other case where losses, accidents, injuries or damages shall have been due to causes within the control of the Contractor, or where such losses, accidents, injuries or damages could have been prevented by the Contractor by the exercise of a degree of care exhibited in high grade repair yard practice, including (but not limited by such specific mention, the generality of this requirement), the following precautions:

"The Contractor shall take precaution to protect the ship from fire in every possible way, including the prompt removal of rubbish, care in the use of inflammable materials and torches, care of electric wiring, strict prohibition against smoking, and in all other ways to prevent fires and add to the safety of the ship. The United States Lines reserves the right to permanently refuse admittance to the ship, or expel therefrom any of the Contractor's employees who violate the rules laid down from time to time to carry out the intent of these clauses.

"The Contractor shall maintain an efficient system of inspection over the activities of welders, acetylene burners, painters and similar workmen employed by him under this contract, so as to minimize the danger of fires occurring through carelessness or otherwise. He shall have at all times while such work is in progress, a line of fire hose, under pressure, available in each section involved and at least one man on duty at all such times solely for the purpose of operating this hose in emergency. In addition, the Contractor will provide chemical fire extinguishers in ample quantities (and sand boxes or other approved oil fire extinguishers and at all locations where directed) to supplement the hose protection. Wherever steel plates are being burned through under this specification, adequate provision must be made to prevent sparks coming in contact with inflammable material; and the Contractor will be required to adopt such other rea-

sonable measures in this connection as may be directed by the United States Lines.

"Wherever a rivet forge is being used over a wood deck, it shall be set in a tight, shallow, metal-lined pan, at least four feet by five feet to protect wood deck from cinders, coals and hot rivets. If, in spite of this precaution, burned spots occur on the deck in the vicinity of the rivet forges, contractor shall patch or replace the deck in a suitable manner approved by United States Lines' representative, to remove such burns.

"3. For the purpose of this contract, the vessel shall be considered as having been delivered to the Contractor when access thereto has been afforded the Contractor, whether the vessel be at the Contractor's plant, at anchor in a stream or harbor, tied up at a wharf, dock, pier, loading or discharging berth, in dry dock or elsewhere and in whatever condition; and for the purposes of this contract, the vessel shall be considered as being in the possession of the Contractor until the work hereunder shall have been completed to the satisfaction of the United States Lines, irrespective of where or in what condition the vessel may be. Completion of this contract shall include the removal from the vessel of all the Contractor's tools, equipment, etc., and all rubbish.

"4. The Contractor shall at its own expense protect and save harmless the United States of America, the United States Shipping Board, the United States Shipping Board Emergency Fleet Corporation, the United States Lines, and the vessel, from all claims and liabilities ordinarily covered by proper casualty or liability insurance, and Workmen's Compensation Insurance. It is expressly understood that the workmen engaged upon the work hereunder shall at all times be employees of the Contractor and/or sub-contractors, and not of the United States of America, or of the United States Shipping Board, or of the United States Shipping Board Emergency Fleet Corporation, or of the United States Lines.

"5. The Contractor shall be responsible for the safety and proper keeping of materials, equipment and supplies furnished by the United States Lines for the purpose of being installed in the vessel or used in the work. In the event of loss or damage to such materials or supplies after being furnished by the United States Lines and before being installed or used, the Contractor shall replace the articles or repair the damages at his own expense."

Paragraphs 6, 7, 8, 9, and 10 are omitted as immaterial.

"11. The United States Lines reserves the right to maintain at its own expense, officers, watchmen and crew on board the vessel who shall be solely responsible to it and under its sole direction."

Article 17 of the contract is as follows:

"1. All understandings and agreements of every kind heretofore had or alleged to have been had between the parties hereto, or any of their agents or representatives, whether written or verbal, are embodied in this contract, which is now the one and only contract between the parties hereto relative to this subject matter."

The builder's risk insurance required to the amount of the contract was secured by the shipyard, and is not in controversy.

The vessel left New York January 6, arrived at the shipyard January 7, and the fire occurred March 10, all in the year 1926. A considerable part of the crew remained aboard while the work was in progress. Under the contract, the repairs were to be completed not later than March 11, and the demurrage for delay was fixed at $4,000 for each day. The contract was 99¼ per cent. complete at the time of the fire.

The fire broke out in a stateroom where were a plumber, who was working on a pipe, using a lighted plumber's furnace, and two joiners, all employees of the shipyard. A carpenter's sawhorse and miscellaneous tools were in the stateroom.

The loss occasioned by the fire was in excess of $2,000,000.

The United States filed its libel charging negligence on the part of the shipyard, and asking recovery for the entire damages. Answer was filed by the shipyard. Numerous interrogatories were filed by the United States and answered by the shipyard. Evidence was taken and the judge below entered an interlocutory decree, holding the shipyard liable, from which decree this appeal was taken. The United States also filed its cross-appeal, complaining that the court below had in its decree failed to hold the shipyard liable under the demurrage clause in the contract. No ascertainment of the actual amount of the damage has been had.

There are three questions involved: (1) Was the shipyard, through negligence, liable for the damage occasioned by the fire? (2) If liable, did the government's agreement with respect to insurance operate to relieve the shipyard of liability for the loss to the extent of the amount of the insurance that the United States agreed to carry, or $2,000,000? (3) Is the shipyard liable for demurrage?

On the first question we agree with the

finding of the judge below, that the shipyard was liable for the damage. In reaching this conclusion the learned judge said in part [21 F.(2d) 112]:

"It is contended on behalf of the United States that the failure of the shipyard to complete the repairs and deliver the vessel in the condition required by the contract was a breach thereof, and imposes upon the shipyard the burden of proof to excuse the failure on its part to perform its obligations under the contract. On the other hand, it is insisted on behalf of the shipyard that the libel charges negligence on the part of the shipyard in failing to exercise the degree of care exhibited in high grade repair yard practice in performance of the work, and the precautions necessary for the safety of the vessel, and that, therefore, under the rule—that he who charges negligence must prove it—the burden of proof is on the United States.

"The question is important, because of the paucity of evidence of the cause of the fire. Although it was stated at the trial that witnesses were at hand, who were present in the room in which the fire started, they were not called by either party. The United States relied upon the answers to certain of the interrogatories which they duly offered in evidence, and the shipyard was content to leave the proof in this respect where the United States stopped. If the burden of the evidence was with the United States, and if to sustain that burden it was necessary that they should prove by clear and satisfactory evidence that the negligence of the shipyard was the proximate cause of the damage complained of, a much more difficult case is made than if the burden of proof is on the respondent to show that it was not negligent in the performance of the work.

"In the recently decided case of International M. M. S. S. Co. v. Fletcher Co., 296 F. 855 (C. C. A. 2d Circuit), which arose out of a fire on a vessel in a shipyard, Judge Hough, speaking for the Court, announced the following as the applicable rule: 'Undoubtedly the general rule is that negligence is never presumed, and he that alleges it must prove the same; yet where one receives a chattel in certain condition, and redelivers it with marks of injury that only culpable negligence would probably cause, "it is the bailee who should open his mouth and make explanation to relieve himself;" and certainly slight evidence under such circumstances will shift the burden of evidence. Schouler, Bailments, Section 23, and cases cited.'

"In an equally recent English case in the Court of Appeal (The Ruapehu, 21 Lloyd's List Law Rep. 310) the question of the onus of proof, under circumstances very much like those present in this case, was discussed with great learning, and the conclusion reached by Lord Justice Atkin as to the correct rule was as follows: 'If this were a pure bailment, a delivery of a chattel to a bailee, entrusted with the chattel to execute repairs on it and redeliver it to the owner, I apprehend that the bailee would be under the obligation to exercise reasonable care and skill in preserving the safety of the chattel. If he failed to deliver the chattel at all, the onus would be upon him to show that the nondelivery was not due to absence of care and skill on his part. Moreover, if he redeliver the chattel in a damaged condition, or if during the bailment, the chattel were damaged, so that when repaired it would be redelivered damaged, the onus is upon the bailee to show that the damage was not due to the absence of reasonable care and skill on his part.' He then continues: 'If, then, the present case were not complicated by the presence on the ship of some of the owners' servants, there would seem to be a simple case of bailment, and an onus on the defendants to show that the fire was not caused by negligence on their part. How far is the position altered by the presence of the owners' servants? I do not think that the rights reserved to the owners to retain the use of the vessel for certain purposes prevents the transaction from being one of bailment; but I think that the principle of onus of proof must in such a case be modified, though not destroyed.' In applying the rule he says: 'A material question in this case would appear to be: When did the fire originate? If during the working hours, the onus would be upon the defendants to show that it was not occasioned by their negligence. If during non-working hours, then the plaintiffs must discharge the onus of showing that injury was caused from defendants' negligence.'

"Another case in which the rule is extended farther than in either of the two preceding cases is that of Pan-American Co. v. Robins-Dry Dock Co., 281 F. 97 (C. C. A. 2d Circuit). That was a suit against a shipyard to recover damages occurring to libellant's steamer by a collision caused by defective repair work. The late Judge Rogers, in discussing the question, said: 'The burden was on the libellant to prove the contract, and that at the time the respondent delivered back the ship the telegraph was not properly adjusted and in good working condition. This burden was sustained.' Here it is admitted. 'The presumption then arose that the

respondent had not performed its contract, and was responsible for the condition in which the telegraph then was. The burden then rested on the defendant to overcome this presumption, and to establish by a preponderance of the evidence that it had fully performed its agreement, and that the crossing of the wire and chain connection of the ship's telegraph was not due to its workmen's lack of skill, or careless conduct of the work, while the ship was in the respondent's possession.'

"The cases cited in respondent's note—like Southern Railway Co. v. Prescott, 240 U. S. 632, 36 S. Ct. 469, 60 L. Ed. 836—are not, in my opinion, in point, for in all such cases the bailee was a mere custodian, whereas in the cases from which I have quoted, as in this case, the bailment was that known as locatio operis faciendi. Pan-American Co. v. Robins, etc. (C. C. A.) 281 F. 108.

"The result is, I think, to place the burden of proof in such cases upon him who has the best opportunity of knowing, and therefore being able to explain, the cause of the damage. In other words, in the case of damage to a vessel delivered to a shipyard for repairs, where the crew remain aboard, but where the shipyard employees are in control of the parts of the ship under repair, and the fire which caused the damage started there, the burden of explanation would be upon the respondent. If it started where libellant's servants were in charge, the burden of showing that the negligence of the respondent was the proximate cause would have to be borne by the ship, which is just another way of saying that, in all cases of delivery of property to a bailee for repair, the latter is required to redeliver in accordance with the agreement, or to show that his failure to do so is not due to his own negligence."

The ship had been delivered to the shipyard, and at the time of the fire was lying moored at the shipyard's dock. The fire broke out in a stateroom where only employees of the shipyard were present. The admitted circumstances are such as to place upon the shipyard the burden of proving absence of negligence on its part or the part of its employees. No attempt was made to assume this burden, and on this theory the United States is undoubtedly entitled to recover. A prima facie case of negligence was undoubtedly made out. International M. M. S. S. Co. v. W. A. Fletcher Co. (C. C. A.) 296 F. 855; Chesapeake & O. Ry. Co. v. Thompson Mfg. Co., 270 U. S. 416, 46 S. Ct. 318, 70 L. Ed. 659; The Ruapehu, 21 Lloyd's List Law Rep. 310.

This court in Kohlsaat v. Parkersburg Co., 266 F. 285, 11 A. L. R. 686, after stating this rule and noticing the distinction between the burden of proof and the duty to go forward, says that the defendant must explain how the damage occurred, and further: "And this is entirely reasonable, for presumably the facts in that regard are within his knowledge."

Even were it not true that a prima facie case of negligence was made out, we are of the opinion, from the answers to the interrogatories and from other admitted facts in the case, that the United States has affirmatively proven its case. The shipyard had not complied with the requirements of the contract respecting precautions to be taken against fire in the matter of convenient fire hose and a man to use it; a plumber was operating a lighted open flame furnace, without a helper, in a stateroom recently painted; proper fire extinguishers were not at hand—all not only demanded by the obligation resting on a properly conducted shipyard, but expressly stipulated in the contract. Except for negligence on the part of employees of the shipyard, the fire would not have occurred, and, had the proper precautions been taken, it could easily have been put out without great damage. Atlas Powder Co. v. Benson (C. C. A.) 287 F. 797. The shipyard, on either theory, was liable for the loss.

On the second point, we cannot agree with the conclusion reached by the judge below, that the clause in the contract with respect to insurance did not relieve the shipyard of liability for any part of the loss, and that the insurance in no way inured to the benefit of the shipyard.

It is apparent that the insurance clause in article 10 of the contract, above set out, is ambiguous, and necessitates the taking of evidence as to its meaning, and evidence showing the circumstances leading up to and surrounding its adoption is clearly admissible. It is not stated what the amount of "the present hull, machinery and equipment insurance," that the United States was to continue, was, with what company it was carried, what the provisions of the "present insurance" were, and no details are given in the contract respecting the "present insurance." Of necessity these facts must be ascertained outside the contract. It hardly seems necessary to quote the innumerable authorities to this effect.

"Previous and contemporary transactions * * * may be very properly taken into consideration to ascertain the subject-matter of a contract, and the sense in which the parties may have used particular terms."

Brawley v. United States, 96 U. S. 168, 24 L. Ed. 622, 624.

"Although a written agreement cannot be varied (by addition or subtraction) by proof of the circumstances out of which it grew and which surrounded its adoption, yet such circumstances are constantly resorted to for the purpose of ascertaining the subject-matter and the standpoint of the parties in relation thereto. Without some knowledge derived from such evidence, it would be impossible to comprehend the meaning of an instrument, or the effect to be given to the words of which it is composed. This preliminary knowledge is as indispensable as that of the language in which the instrument is written. A reference to the actual condition of things at the time, as they appeared to the parties themselves, is often necessary to prevent the court, in construing their language, from falling into mistakes and even absurdities." Reed v. Merchants' Mut. Insurance Co., 95 U. S. 23, 24 L. Ed. 348, 349.

See, also, Nash v. Towne, 5 Wall. 689, 18 L. Ed. 527; United States v. Bethlehem Steel Co., 205 U. S. 105, 27 S. Ct. 450, 51 L. Ed. 731; Lowrey v. Hawaii, 206 U. S. 206, 27 S. Ct. 622, 51 L. Ed. 1026.

A careful examination of the circumstances leading up to and surrounding the making of the contract must lead to the conclusion that it was intended by the parties that the United States assumed, by the insurance clause, the risk of loss by fire up to the amount of $2,000,000, and that this assumption of risk was not only for the benefit of the United States, but for the benefit of the shipyard also. To hold otherwise would be to hold that the agreement on the part of the United States to carry the "present hull, machinery and equipment insurance," had absolutely no meaning whatever, and was of no value to the shipyard.

The bid of the shipyard under the first specifications included an item of $5,000. After a conference between the representatives of the United States and the shipyard, at which the insurance item was fully discussed, it was agreed that the United States was to carry insurance to the amount of $2,000,000 on "hull, machinery and equipment" while the repairs were being made, and the bid of the shipyard did not include the $5,000 item for insurance. This latter fact the representatives of the United States knew. It is not denied that the $5,000 would have purchased commercial insurance that would have protected both the owner and the contractor against the very loss that actually occurred, to the amount of $2,000,-

000. The United States accepted the benefit of the $5,000 in the reduced bid of the shipyard. In effect the shipyard paid the United States the same premium it would otherwise have paid a commercial insurance company, and should receive from the United States the same protection it would have received from the commercial company.

The fact that the "present insurance" carried by the United States Lines, a tradename used by the United States in operating its ships, on the America, was not insurance at all in the commercial sense, but was only a system of bookkeeping by which the United States Lines carried its own insurance, does not alter or change the effect of the contract entered into. Some consideration must have passed to the shipyard for the $5,000 reduction in its bid, and the United States must have given some consideration for the $5,000 it received as certainly as if it had been paid in cash. The parties to the contract certainly understood it as giving the shipyard insurance protection, and at the time it was entered into, and the Superintendent Engineer of the United States so testified.

We agree with the judge below when he said:

"There can be no doubt, I think, that a contract whereby the United States agreed to assume all liability for damage to its vessel while at the yard would be valid. Santa Fe Railway v. Grant, 228 U. S. 177, 33 S. Ct. 474, 57 L. Ed. 787. I think it is equally true that a contract might have been made whereby the United States would agree to give the shipyard the benefit of its insurance. International S. B. Company v. Fletcher, supra."

The provision in the contract as to the builder's risk insurance to be furnished by the shipyard, insurance that protected both the owner and the contractor, is strong evidence as to the intention of the United States to assume the risk on the hull up to the amount of the "present insurance." The use of the word "but" further down, would seem to contrast the two obligations in the proviso—first, the government's obligation to carry the risk on hull to the amount of the "present insurance"; second, the shipyard's obligation to carry the risk on betterments.

It is contended on behalf of the United States that there are other clauses in the contract inconsistent with construing it so as to give the shipyard any protection under the insurance clause. This condition evidently arose from the fact that, when the contract was changed as to insurance, corresponding changes in other clauses were neglected.

Such a situation certainly should not operate to make meaningless and void a provision evidently intended to have some effect as to the shipyard.

To say that the meaning of the provision in the contract, as to insurance was that the United States was only to protect itself, and to allow recovery from the shipyard for the total of the damages, would be to place the parties in the exact situation they would have been in without any provision whatever in the contract as to insurance. Something must have been intended by the parties when the insurance provision was written in the contract.

The conclusion once reached as to the meaning of the contract, it is not necessary to cite authorities as to its effect; yet there are some decisions on somewhat similar contracts that are of interest. In S. J. Brice Sons v. Christiani & Nielsen, 30 Lloyd's List, 177, the court said:

"I find in this contract that the parties agreed with one another that the owners should insure against all risks at the expense of the hirer. It seems to me that that points most clearly to this: That the hirer stipulates that as regards risks he is not to be responsible for them; as regards risks the owner is to insure, and the hirer will pay for it. That is what I think it means. I think it indicates clearly—it is not well put, of course, it might be expanded—but it indicates quite clearly that the foundation of this clause is an arrangement that the hirer is to be free of risk and is not to take the risk, that he will pay for it being insured against, and that is what I think it means, and I think that there is no difficulty in that; it is a very common sense arrangement for these people to have made."

Certainly the arrangement here for the United States to carry the risk to the extent of $2,000,000, and get the benefit of the $5,000 was a "common sense arrangement for these people to have made."

See, also, Hagan Lumber Co. v. Duryea School Dist., 277 Pa. 345, 121 A. 107; Gallagher v. St. Patrick's Church, 45 Neb. 535, 63 N. W. 864.

" * * * A contract that the bailee would assume no liability growing out of risks ordinarily, or that could be insured against, would be legally enforcible between the parties, if it is a real meeting of minds, made on due consideration." International M. M. S. S. Co. v. W. & A. Fletcher Co. (C. C. A.) 296 F. 855, 860.

"The parties, then, were free to make their own bargain as to this transportation and the liability which should attach to it. There is no rule of public policy which denies effect to their expressed intention, but, on the contrary, as the matter lies within the range of permissible agreement, the highest public policy is found in the enforcement of the contract which was actually made. Undoubtedly, it is not to be lightly concluded that the railroad company has been relieved from liability for its neglect, but, on the other hand, if this was the agreement as fairly interpreted, it is not to be arbitrarily overridden. The parties were on an equal footing. The risk of loss or damage to the grading outfit or supplies from any cause, while being transported over the line of the railway company, could be assumed by one party or the other, as they saw fit. This risk was an item which naturally would enter into the calculations of the parties with respect to the rate to be charged by the railway company. We are not at liberty to revise the contract, and the question simply is whether the stipulation against liability, in view of the reduced rates, covered all losses,—those which might be due to the carrier's neglect, as well as others." Santa Fé, P. & P. R. Co. v. Grant Bros. Construction Co., supra.

See, also, Raymond Concrete Pile Co. v. Standard Oil Co. of New Jersey et al. (C. C. A.) 264 F. 66, 12 A. L. R. 1404.

The United States contracted to carry the risk of fire on the hull, machinery, and equipment, to the amount of $2,000,000, and received an adequate premium therefor. The holding below on this point is reversed.

The court below having failed to pass on the third point involving the question of demurrage, it is not considered necessary to discuss it here, reserving it until passed on by the trial court. Affirmed in part, reversed in part and remanded.

Affirmed in part. Reversed in part.

PARKER, Circuit Judge (dissenting in part). I agree with the majority of the court that the Shipbuilding & Dry Dock Company is liable on the ground of negligence for the damage occasioned by the fire, and that the question of demurrage need not be considered by us until it has been passed upon by the court below; but I dissent from so much of the decision as holds that the company, by virtue of contract with the government, is relieved of liability for its negligence to the extent of the government insurance on the vessel. In other words, I think that the decree of the District Judge should be in all respects affirmed.

So far as the questions here involved are

concerned, the contract seems to me to be clear and free of ambiguity and not to require resort to parol evidence for interpretation except to identify "the present hull, equipment and machinery insurance" to which it refers. Resort may not be had to parol to create ambiguity to be solved by parol. I do not stress this, however, for, whether the contract be taken alone or in connection with the negotiations which led up to its execution, I do not think that it can be construed as giving the company the benefit of the insurance carried by the government or as relieving it to that extent of liability for its negligence.

It is true, as contended by the company, that under its first bid it contemplated taking out builder's risk insurance covering the value of the vessel, which would have protected its own interests as well as those of the government. This bid, however, was not accepted. The specifications were changed on submission for new bids; and the effect of one of the changes was that the government would "*continue* the *present* hull, equipment and machinery insurance," and that the contractor would be required to carry builder's risk insurance only to the amount of the contract. It should be borne in mind, in this connection, that, in stipulating to continue the present insurance, the government was stipulating to continue insurance which protected the government alone. It did not stipulate that the contractor should have the benefit of this insurance or that he should be relieved from liability to the extent thereof. The only effect of the new specifications, therefore, so far as insurance was concerned, was to make it clear that the contractor was not required to carry insurance for the protection of the government to cover the value of the vessel, but only for the value of the repairs to be made. There was nothing in them from which a contractor could have concluded that he was to have the benefit of the existing insurance which was to be continued, that he was to be relieved from liability to the extent thereof, or that he was in any wise relieved of the necessity of protecting himself with legal liability insurance if he desired protection of that sort.

This change in the specifications respecting insurance came about because of a controversy which arose between officials of the shipbuilding company and the officials of the government as to the protection which the government was to receive from the shipbuilding company (for full discussion thereof see opinion of the District Judge [21 F.

(2d) 117–119]); but there was nothing in this controversy, or in any part of the conversation connected therewith, which would warrant the conclusion that the shipbuilding company was to have the benefit of the government insurance which was to be continued or that it was to be relieved of legal liability for negligence because of same. It was after this controversy that the specifications were changed, but it is to be noted that they were changed, not only with respect to the requirement of insurance, but also as to many other matters. As changed, they were resubmitted to other bidders as well as to the shipbuilding company, and competitive bids were submitted on the basis of their provisions. The bid of the shipbuilding company upon which the contract was awarded was not merely $5,000 less, but approximately $100,000 less, than its original bid, and there was nothing in it or in the original bid to indicate what was included or eliminated on account of insurance.

It appears, therefore, that the negotiations leading up to the contract, as well as the contract itself, contemplated nothing more than that the government should continue its existing insurance on the vessel, or, to use the exact language of the specifications and contract, "the present hull, machinery and equipment insurance." This "present insurance" was so-called "government insurance" under the usual form of marine policy, insurance which protected the interest of the government alone. I cannot conceive how the continuance of such insurance could inure to the benefit of the shipbuilding company, which was not protected by it, so as to give that company in effect the benefit of legal liability insurance, to the amount of the policy, or how it could be held to exempt the company from liability on account of its negligence.

The case of S. J. Brice Sons v. Christiani & Neilsen, 30 Lloyd's List, 177, cited in the opinion of the court, if I understand that decision, is a very different case from this. There it was agreed that the owners of a crane barge should take insurance at the expense of the hirer covering all risks. The insurance, although to be paid for by the hirer, was to be for the benefit of both. The owner failed to perfect the insurance according to agreement, and the barge was damaged. It was held that, although this damage was due to the negligence of the hirer, the owners could not recover therefor because of their failure to perfect insurance according to agreement which would have protected the hirer. In the case at bar, the government in-

surance which was to be continued, and was continued, was not of the kind which would protect the shipbuilding company.

Some confusion arises in this case because the government, as the owner of many vessels, carried its own insurance. It will simplify matters, therefore, to assume, for the sake of the argument, a case in all respects like this, except that the insurance is carried, as in ordinary cases, with a private insurance company. In such case there would be no question as to the right of the government to recover damages for negligence, notwithstanding its insurance. The insurance company, if it paid the policy, would be entitled to subrogation to the rights of the government to recover damages from the shipbuilding company (see Liverpool, etc., Co. v. Phenix Ins. Co., 129 U. S. 397, 463, 9 S. Ct. 469, 32 L. Ed. 788, Inman v. S. C. Ry. Co., 129 U. S. 128, 9 S. Ct. 249, 32 L. Ed. 612, and Luckenbach v. W. J. McCahan Sugar Refining Co., 248 U. S. 139, 148, 39 S. Ct. 53, 63 L. Ed. 170, 1 A. L. R. 1522); but under no possible theory would the shipbuilding company have any right against the insurance company.

Now the fact that the government carried its own insurance, instead of having it carried by a private insurance company, cannot help the shipbuilding company. If the government insurance be conceived of as real insurance, then when the government as insurer pays the loss of the government as owner, it is subrogated, like any other insurer, to the rights of the owner against the party whose negligence has caused the loss. If, however, the bookkeeping fictions are ignored, and the fact is faced that under government insurance the government is both insurer and insured and consequently has no insurance, then an agreement to continue the present government insurance is in reality nothing but an agreement on the part of the government to continue without insurance. It is manifest that an agreement to continue without insurance is not an agreement to perfect insurance which will protect the shipbuilding company, nor is it an agreement that that company shall be released from legal liability for its negligence.

It should not be ignored that the provision here in question was inserted in the contract under article X, entitled "Protection and Insurance," and that every provision of the article was manifestly inserted for the protection of the government. The provision is a part of section 2 of article X, which section begins with the declaration, "Without limiting by the provision hereof any liability of the contractor howsoever arising, it is understood," etc., which provides further on, "The contractor shall take precautions to protect the ship from fire in every possible way, including the prompt removal of rubbish, care in the use of inflammatory materials and torches," etc., and which contains many other provisions looking to the proper protection of the vessel. These provisions, which enjoin the highest degree of care on the shipbuilding company, are entirely inconsistent with an intention to relieve that company of liability for its negligence. While, of course, it is permissible to contract against liability for negligence, no contract ought to be construed to have that effect unless such intention clearly appears. McCormick v. Shippy (C. C. A. 2d) 124 F. 48, 51; International M. M. S. S. Co. v. W. & A. Fletcher Co. (C. C. A. 2d) 296 F. 855, 860. Here not only is there no provision in the contract expressly relieving the company of liability for its negligence, but the provisions requiring particular care on the part of the company negative, it seems to me, beyond peradventure the idea that it was intended to relieve against negligence.

It is said, however, that, unless the meaning which the majority of the court ascribe to the provision in controversy be given to it, it is entirely meaningless. I do not think so. Under the original specifications, the company was required to protect the vessel for the benefit of the government by what is known as "builder's risk" insurance. Incidentally, such insurance would have protected the contractor also, but this was a phase of the matter in which he alone was interested and not the government. He could have obtained the same protection for himself, doubtless at much less cost, under legal liability insurance if protection of the government's interest were not required. Now the provision in question relieved the contractor from the obligation of carrying insurance for the protection of the government except in an amount necessary to cover the cost of the new construction. This relieved the company of paying for such insurance for the benefit and protection of the government; and a loss not due to the negligence of the company under such circumstances would have fallen upon the government as the carrier of its own insurance, or as having no insurance. The government, under the agreement, assumed the risk of not being insured except to the amount of the repairs; but, of course, this is not the same thing as releasing the company from liability for its negligence.

It is said also that the shipbuilding company reduced its bid by the amount of $5,000 because of not being required to carry builder's risk insurance, which would have protected both it and the government, and that the government got the benefit of this reduction; and it is asked what the shipbuilding company received in return therefor. The answer is that, as a matter of fact, the shipbuilding company made no reduction in any bid. Its first bid was rejected along with all other bids received on the first specifications, and the specifications were thereupon changed. Its second bid was approximately $100,000 less than its first. If it eliminated $5,000 on account of not being required to take builder's risk insurance for the protection of the government, it did so with full knowledge that the only change in the specifications regarding insurance was that the government was to continue its then existing government insurance, which, as we have seen, gave no protection to any one except the government. It is not correct, therefore, to say either that the shipyard did or did not receive anything for reducing its bid; for, as stated, the bid was not reduced, but a new bid was made on amended specifications. Under these specifications, it is true, the company was not required to take insurance for the protection of the government, and this was, no doubt, a reason for eliminating the amount included in its estimate to cover the cost of such insurance. To have been perfectly safe, it should have taken legal liability insurance for its own protection, and the cost of this should have been considered in figuring its bid; but whether it should take such insurance or not was a matter which concerned it alone, as was the amount of its bid. As a matter of fact, the record shows that it had legal liability insurance in the amount of $100,000, which was doubtless deemed sufficient.

It is argued that, if the government had not inserted in the specifications and contract the provision in question, the bid would have been $5,000 higher than it was, and the contractor would have been protected as well as the government. Possibly so; but we must determine the rights of the parties on the basis of what they did, not of what their rights would have been if they had done something which they did not do. Nothing is better settled than that courts will not make contracts for parties, or relieve against improvident provisions or lack of foresight, and that, when the meaning of a contract can be extracted from its terms, it must be enforced as the parties have made it. I think

that, when we lay to one side such matters as what the rights of the parties would have been if they had done things which they did not do or had made agreements which they did not make, there can be no doubt as to the meaning of the written contract here, whether considered alone or in the light of the negotiations leading up to it. The only agreement was that the existing insurance would be continued. This insurance protected the interest of the government alone. Nothing in the contract or in the negotiations supports the conclusion either that the government insurance was to be carried for the benefit of the shipbuilding company or that that company was to be relieved of liability for its negligence.

For the reasons stated, I think that the decree appealed from should be affirmed.