## THE FIRE ISLAND.

### SOUTH SHORE NAV. CO., Inc., v. BRIDGE-PORT DREDGE & DOCK CO.

No. 12917.

District Court, E. D. New York.

Dec. 13, 1932.

Thomas A. McDonald, of New York City (Isidor J. Copperman, of New York City, of counsel), for libelant.

Macklin, Brown, Lenahan & Speer, of New York City (Richard F. Lenahan and Gerald J. McKernan, both of New York City, of counsel), for respondent.

BYERS, District Judge.

The libelant, as owner of the motor vessel known in June, 1931, as the Patchogue, seeks to recover the damages said to have been sustained by the vessel, because it was negligently hauled out on the marine railway of the respondent at Bridgeport, Connecticut, on June 3, 1931.

The Patchogue is a passenger vessel, built in 1912, now plying between Babylon, L. I., and Fire Island, across the Great South Bay. She is of composite type construction; that is, wooden hull, with oak double 3-inch frames, 5x6, spaced 18 inches between centers, with steel angle iron deck frames, spaced 18 inches between centers; there are steel longitudinals below deck, and three steel thwartship bulkheads; the deck is wood.

The vessel is 105 feet long, 23 feet beam, and her greatest draft is 3 feet; she is therefore a shallow draft vessel, having twin screws.

In May, 1931, her original engines and boilers were removed, in Brooklyn, and she was placed in dry dock at Shewan's, where the tail shafts were drawn, examined and replaced (i. e., on deck), and general caulking and painting were done following a three-year lay-off, during which time she was out of commission. Thereafter the vessel was towed to the Wolverine Motor Works, on Johnson's Creek, Bridgeport, Connecticut, where two Diesel motors, weighing about 13,000 pounds each, were installed.

When the shafts had been connected, and the vessel was ready to receive her propellers, she was towed to the respondent's yard to be hauled out on the marine railway, where the propellers were put in place.

This was done pursuant to an exchange of letters between the parties, as follows:

"Great South Bay Marine Corp.
"New York Office
"17 Battery Place
"April 30, 1931

"Bridgeport Dredge & Deck Co., 1024 Main Street, Bridgeport, Conn.

"Gentlemen: We expect in a short time to send a boat to the Wolverine Motor Works for installation of engines and would appreciate knowing if you have any facilities available either for hauling out or docking the boat in the event that it is necessary for us to dock her. This boat is 105 feet long by about 22½ feet beam and draws about 3 feet of water. She is a shallow draft twin screw boat.

"We would appreciate knowing if you have the facilities for such work what the cost of docking would be and what you would charge for lay days.

"Thanking you and awaiting your reply, we remain

"Yours very truly,
"Great South Bay Marine Corp.
"J. W. Fristik
"JRF                    Secretary."

"Bridgeport Dredge & Dock Co.
"River and Harbor Work
"1024 Main Street
"Bridgeport, Conn.

"May 5, 1931.

"Great South Bay Marine Corp., 17 Battery Place, New York, N. Y.

"Gentlemen: Thank you for your inquiry of April 30th, with reference to a boat you are going to send to the Wolverine Motor Works shortly.

"We have a Shipyard and Dock at the Foot of Seaview Avenue, this city, that is well equipped to handle boats of your type mentioned in your letter and we will be glad to dock it when it arrives in Bridgeport if you will let us know a little ahead so that we can arrange for it.

"When other people are repairing the boat, as Wolverine will be for you, we charge

$50.00. Lay Days start noon of the day following hauling and the charge is $15.00 per day.

"Trusting that this information is what you want and that we may hear from you soon, we remain,

"Very truly yours,

"Bridgeport Dredge & Dock Company

"GWS/K      G. W. Sunderlin, Secretary.

"By K"

█ When the work of installing the motors was nearing completion, an officer of the libelant (Thompson) and the respondent's superintendent (Heanue) conversed about a day for docking the Patchogue, and arrived at an understanding that this would take place on June 3, 1931. The latter asked if the former had docking plans, and was told that none were on hand, and they could be procured from Brooklyn.

Heanue says that he casually stated that, if the plans were not provided, the operation of docking would be at the owner's risk. This Thompson denies.

It is found that no such understanding as this was reached between the parties.

This does not mean that Heanue's testimony is disbelieved, but it does mean that he did not put the matter so clearly or plainly that Thompson understood him, or agreed to the suggestion. Nothing of the kind was presaged in the correspondence between the parties; the dimensions of the vessel as stated in the inquiry, and her shallow draft which was mentioned, suggested the shape and type of her under-side; and the fact that she had twin screws told of the struts on either side which supported the shafts.

If the operation could be undertaken only at the owner's risk in the absence of docking plans, the owner was entitled to seasonable and more than casual notice to that effect.

█ The hauling took place between the hours of 2:00 and 4:30 on the afternoon of June 3rd, and is found to have been so contrived that a sag in the hull was developed in the under-sides, near the stern, beginning at about 25 feet forward of the stern. The keel of the vessel was adequately supported by keel blocks, but the bilge blocks were not sufficiently in position aft, to sustain the strain imposed upon the structure of the vessel when her hull was lacking the support it received when afloat.

The bilge blocks were 8 in number, 4 on each side, spaced roughly 15 feet apart, beginning about 30 feet aft of the stem, and this placed the fourth one about 30 feet forward of the stern.

The overhang of the latter was supported by two substantial vertical shores, resting upon the ground, which were put in position after the vessel had been hauled; also by four supporting blocks (two on each side) aft of the bilge blocks and sustaining the counter, and inside the line of the bilge blocks. Of these latter, the forward two were put in place as the boat came out of the water, and the aft two thereafter. They were put in from each side separately.

An inspection of the under-side of the vessel revealed that the stern post, constituting the after end of the dead-wood (which rested upon a shoe which extended from the dead-wood aft to the forward under-side of the rudder) had fallen some ¾ of an inch and caused a noticeable sag in the shoe. Thompson was present, and Heanue called his attention to this, and then inserted a jack under the stern post, and forced it upward into position.

The finding that there was a sag in the stern of the Patchogue as the result of placing her on the marine railway is based upon the testimony of the witness Ryan, who was engaged in his duties as a ship's carpenter, in the cabin, while the operation was proceeding, and observed the upward thrust of some of the planks in the deck while so employed; and of Heanue, who observed evidence of strain on the day following, when the witness MacKenzie, a marine surveyor, inspected the vessel at the owner's request; and of the witnesses Bagger and Terry, who observed evidence that one of the shafts was out of alignment when the vessel reached Shewan's dry dock in Brooklyn, to which the vessel was taken following her experience at Bridgeport.

█ The answer of the respondent, in addition to denying the allegations of the libel to the effect that the Patchogue was negligently docked, alleges that the vessel was not seaworthy and its construction was weak and faulty, and at the time she arrived at the dry dock gave evidence of considerable sagging and having been previously strained; at the trial respondent offered evidence to show that the sagging was the result of the stranding of the Patchogue on her way to the respondent's yard. Three witnesses called by the respondent testified that they observed the vessel grounded at the edge of the channel leading to the Wolverine Motor Company's yard in Bridgeport, while the Patchogue was in tow of her tug which had her alongside, to

port. Those witnesses, who had their own work to do at the time, were distant about half a mile from the tow; their testimony is opposed by that of Ryan, who was on board the Patchogue at the time, and who says that it was the tug that grounded, going toward the dock, and that a man came out with a heaving line in a light rowboat, and those on board the Patchogue pulled it in with the heaving line, and that the Patchogue did not touch bottom at all.

This conflict of testimony is resolved in favor of the libelant, because Ryan was in a much better position to observe what actually took place than any of the witnesses called by the respondent; also the tug drew 7 feet, according to the testimony, and the Patchogue only 3, and it is much more likely that the grounding was that of the tug.

Ryan's testimony, as to what took place when he was at work in the cabin of the Patchogue while she was being hauled, when he saw the deck planks in the act of being pushed upwards by a stanchion, fixes the time of the happening of the injuries for which recovery is here sought; he had not been in the employ of the libelant for a year at the time that he gave his testimony, and therefore is deemed to be a disinterested witness.

When MacKenzie inspected the vessel on June 5th, Heanue made no claim to him that the evidences of strain, which he observed at the time, were the result of the said alleged stranding which could have occurred only when the vessel was taken to the Wolverine yards some days before; if that had been regarded as an important factor in the situation, it would have been the subject of comment at that time.

Having found that the sag in the stern of this vessel was the result of the methods employed in hauling her out on the marine railway, it becomes necessary to consider briefly whether, as a matter of law, the respondent must answer in damages to the libelant. The rule referred to in International Mercantile Marine S. S. Co. v. W. & A. Fletcher Co. (C. C. A.) 296 F. 855, 857, seems to apply.

In that case, a fire occurred on the steamship St. Louis, while she was in the hands of the respondent for certain repairs, and, in prosecuting the work the use of blow torches in the vicinity of varnish remover was held to be negligent and the proximate cause of damage from fire. The opinion contains the following:

"The contract for reconditioning the St. Louis and other vessels belonging to libelants was one of bailment [Pan American Petroleum Transp. Co. v. Robins Dry Dock & Repair Co. (C. C. A.) 281 F. 97], and respondents, the bailees, were to do the work with their own servants, at their own yard. That contemporaneously libelants were to do, and were doing, other work is immaterial. The portion of the ship where fire broke out was wholly under respondents' control.

"The assumption of such an undertaking implies the exercise of ordinary care only, but both care and skill were necessary for due performance, wherefore these bailees by law undertook to do the work with whatever degree of skill was adequate for due performance. 6 C. J. 1118, and cases cited. As Prof. Williston puts it (Contracts, § 138):

"'The degree of care which one who assumes or undertakes a certain act is held bound to exercise depends upon the degree of skill which he professes, and one who professes special skill will be liable for failure to use that skill.'

"While the learned writer just cited is strongly of the opinion that any action against a bailee for nonperformance really sounds in tort, that distinction is of no importance in the admiralty, and we shall assume, with the court below, that on failure to return the St. Louis properly reconditioned, the bailees can be held only on a showing of negligence causing failure to perform.

"Undoubtedly the general rule is that negligence is never presumed, and he that alleges it must prove the same; yet where one receives a chattel in certain condition, and redelivers it with marks of injury that only culpable negligence would probably cause, 'it is the bailee who should open his mouth and make explanation to relieve himself'; and certainly slight evidence under such circumstances will shift the burden of evidence. Schouler, Bailments, § 23, and cases cited."

In this case, the undertaking given by the respondent was to employ the requisite skill to haul the Patchogue out on the marine railway in such a way that no damage would result to the vessel because of the method to be employed. The testimony of Heanue makes it clear that, if he had possessed docking plans that showed the under-body construction of the vessel and the overhang, he would have put the bilge blocks further aft, by one section of the marine railway, namely, 14 feet, 8 inches; that is to say, he would have

used the same number of bilge blocks but he would have put them in position commencing at frame No. 3 and carried them back to frame No. 6 of the cradle.

It is fair to conclude that, if this method had been pursued, the sagging complained of would have been avoided, because it is substantially the practice which was employed in Shewan's dock in Brooklyn when the Patchogue was placed there in May of 1931, prior to the trip to Bridgeport, and again in the latter part of June of the same year, on her return.

When Heanue was informed that no docking plans were available in Bridgeport, he made a personal inspection of the vessel below deck, in order to observe the conformation of the under-body, and, having made that inspection, he assumed the responsibility of proceeding with the hauling, but without the docking plans. If damage has been occasioned as the result of the exercise of that judgment, it should not be visited upon the owner, but upon the bailee.

The extent of the damage can be easily shown by the work that was required at Shewan's yard when the vessel returned to Brooklyn. The fact is that the vessel, according to the testimony, is now in service, and apparently no injury was done which survived the second repairs which were required in order to put the shafts in alignment. That work may be fairly regarded as the natural and probable result of the sagging of the hull brought about by the experience in the respondent's yard.

It is argued that the installation of the Diesel motors might have brought about this result in any case, because the hull of this vessel was somewhat flexible, and the change from steam engines to Diesel motors necessarily brought about some slight changes in alignment, etc. That is purely speculative. The motors were placed in the same position in the hull of the vessel as the engines had occupied, and that which took place in Bridgeport is shown to have been a competent producing cause of the conditions found on June 5th, when Mr. MacKenzie made his inspection.

The motion to strike Heanue's testimony concerning his conversation with Thompson when docking plans were under discussion is denied, for the reason that it is not thought to have changed the legal relations of the parties.

The libelant may take the usual interlocutory decree, with costs.

If findings are desired, they may be settled at the same time, and are to embody appropriate recitals as to ownership and incorporation.